James L. BUCHANAN, et al.,
Plaintiffs-Appellants,

v.

The CITY OF JACKSON and the State of Tennessee, et al.,
Defendants-Appellees.

No. 81–5333.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 30, 1982.
Decided June 7, 1983.

Avon N. Williams, Jr., Richard H. Dinkins, Nashville, Tenn., Napolean B. Williams, Jr., New York City (argued), for plaintiffs-appellants.

Harold F. Johnson, Russell Rice, Sr., Rice & Rice, Jackson, Tenn., Thomas D. Silverstein (argued), Charles S. Rhyne, Washington, D.C., for City of Jackson, et al.

William M. Leech, Jr., Atty. Gen., William P. Sizer, Asst. Atty. Gen., Nashville, Tenn., for Governor of Tenn.

Before LIVELY and MARTIN, Circuit Judges, and RUBIN, District Judge *.

CARL B. RUBIN, District Judge.

Plaintiffs filed this action in March, 1977 challenging the at-large voting procedure for electing Jackson, Tennessee's three-member Board of Commissioner's.

In their Complaint, plaintiffs alleged that the at-large system violates the Thirteenth, Fourteenth and Fifteenth Amendments to the Constitution and various federal statutes by diluting the voting strength of Jackson's black citizens and depriving them of meaningful participation in the political processes of that city. Four years after this suit was filed, the District Court granted defendants' Motion for Summary Judgment based upon the United States Supreme Court's decision in *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). On appeal, plaintiffs contend that summary judgment on the disputed question of discriminatory intent was improper. Plaintiffs also seek reversal of the District Court on the ground that *Rogers v. Lodge,* —— U.S. ——, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982), a second voting dilution case, and the recent amendment to the Voting Rights Act of 1965, 42 U.S.C. § 1973 *et seq.,* after the legal standards upon which the District Court based its decision.

The City of Jackson, Tennessee is governed by a three-member Board of Commissioners. Each Commissioner is elected at large and runs for one of three designated positions: (1) the Mayor, who serves as Commissioner of Public Affairs, Public Safety, Revenue and Finance; (2) the Commissioner of Streets, Health, and Sanitation and Public Improvements; and (3) the

---

* The Honorable Carl B. Rubin, Chief Judge of the United States District Court for the Southern District of Ohio, sitting by designation.

Commissioner of Education, Parks, Recreation & Public Property. An individual must designate which of these positions he is a candidate for and must receive a majority of the votes cast in order to be elected. In the event no candidate receives a majority, a run-off election is held between the two candidates receiving the most votes. Jackson has utilized the Commission form of government since 1915, when the General Assembly of the State of Tennessee enacted Chapter 168 of The Private Acts. Prior to that time, Jackson was governed by a Mayor and alderman elected by geographic district.

Plaintiffs in their Complaint made the following specific allegations in support of their contention that the at-large system for electing Jackson's Board of Commissioners results in unconstitutional vote dilution. First, plaintiffs claimed that the political processes leading to nomination and election in Jackson were not equally open to participation by blacks. In this regard, plaintiffs cited the fact that no black has ever been elected to the office of Commissioner or any other city-wide elective office, the lower registration rate of black voters alleged to be attributable to official action prior to 1950, racially polarized voting in instances where blacks had run for city-wide office, the few blacks who serve on various city boards, alleged discrimination against blacks in municipal employment, and the exclusion of blacks from the leadership of political party organizations within the city. Plaintiffs also claimed that historically based discrimination and segregation in housing, education, public facilities and employment, and an alleged disparity in the provision of municipal services between black and white neighborhoods, support their general allegations of unlawful vote dilution.

The District Court granted summary judgment on all of plaintiffs' statutory and constitutional claims based primarily on the Supreme Court's decision in *Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). In *Bolden*, a case strikingly similar to that now before us,[1] the Supreme Court set forth the standard for determining the constitutionality of an at-large electoral system.

The Court in *Bolden* first held that in order to establish a violation of the Fifteenth Amendment, a plaintiff must show both a discriminatory motivation and an interference with the actual registration or voting process. 446 U.S. at 65, 100 S.Ct. at 1498. Because it was undisputed that blacks in Mobile "registered and voted without hindrance," the plaintiff's Fifteenth Amendment and Voting Rights Act claims were summarily rejected.[2]

A majority of the Court in *Bolden* also agreed that an at-large voting system violates the Equal Protection Clause of the Fourteenth Amendment only if it is shown that the system "was conceived or operated as a purposeful device to further racial discrimination." *Whitcomb v. Chavis*, 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971). The disproportionate effects of an electoral system do not alone establish a discriminatory purpose. 446 U.S. at 66, 100 S.Ct. at 1499. In applying this standard to the evidence relied upon by the lower courts in the case before it, however, no view commanded a majority of the Court.

Justice Stewart, writing for the plurality, rejected the District Court's primary reliance upon certain of the so-called *Zimmer* factors, derived from the decision of The United States Court of Appeals for the Fifth Circuit in *Zimmer v. McKeithen*, 485

---

1. *Bolden* involved a challenge to the City of Mobile, Alabama's at-large system of electing its three-member Board of Commissioners. Mobile had utilized this system since 1911 and although blacks represented approximately 35.4% of the population, no black had ever been elected to the Commission. 423 F.Supp. 384 at 386, 388 (S.D.Ala.1976).

2. The Supreme Court held that Section 2 of the Voting Rights Act of 1965 "was intended to have an effect no different from that of the Fifteenth Amendment itself." 446 U.S. at 61, 100 S.Ct. at 1496.

F.2d 1297 (5th Cir.1973).[3] Although conceding that the circumstantial factors derived from *Zimmer* "may afford some evidence of a discriminatory purpose," the plurality stated that *Zimmer* criteria were not *alone* sufficient proof of such a purpose, and specifically rejected those relied upon by the District Court as "most assuredly insufficient." 446 U.S. at 73, 100 S.Ct. at 1502.[4]

Four members of the Court in *Bolden* argued that assuming proof of a discriminatory intent was required, the evidence below established such intent. Justice White claimed that the plurality's piecemeal rejection of the circumstantial evidence relied upon by the courts below was inconsistent with the "totality of the circumstances" approach endorsed by the Court in *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

■ The District Court in this case summarily dismissed plaintiffs' statutory and Thirteenth Amendment claims for failure to state a claim upon which relief can be granted. Appellants have not pressed these claims on appeal. The District Court also rejected plaintiffs' Fifteenth Amendment claims based upon *Bolden* because the record established that blacks in Jackson registered and voted without interference. Although appellants take exception to this ruling, we find the application of *Bolden* to plaintiffs' Fifteenth Amendment claims appropriate. Absent any allegation of actual interference in the voting or registration processes, plaintiffs have failed to state a claim under the Fifteenth Amendment.

With respect to plaintiffs' claims under the Fourteenth Amendment, the District Court concluded that plaintiffs had "failed to offer any proof of discriminatory intent on the part of defendants," and that the additional allegations offered by the plaintiffs in opposition to defendants' Motion for Summary Judgment were insufficient to support a finding of purposeful discrimination under the standard established by *Bolden*.[5] The District Court also stated that plaintiffs had "failed to prove that the disputed plan was conceived *to operate* as a purposeful device to further racial discrimination.[6]

The appellant argues that the District Court's decision should be overturned and the case remanded in light of Congress' recent amendment of the Voting Rights Act of 1965, 42 U.S.C. § 1973 *et seq.* and the recent Supreme Court decision in *Rogers v. Lodge,* —— U.S. ——, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982). For reasons which will become apparent we will consider these developments in the reverse order from which they were raised.

*Rogers v. Lodge, supra* involved yet another challenge to an at-large procedure for

**3.** The Court in *Zimmer* identified the following factors as bearing upon a claim of unconstitutional vote dilution: (1) lack of minority access to the process of slating candidates; (2) unresponsiveness of legislators to the particularized interests of the black community; (3) the strength of the state policy "underlying the preference for multi-member or at-large districting; and (4) the existence of past racial discrimination in the community. The Court also considered the existence of large districts, majority vote requirements, anti-single shot voting provisions and the lack of provision for at-large candidates to run from particular geographic subdistricts, as additional factors "enhancing" a claim of unconstitutional vote dilution. 485 F.2d at 1305.

**4.** The lower courts in *Bolden* found the following aggregate of *Zimmer* factors present in Mobile: (1) the absence of any black elected to the Board of Commissioners; (2) discrimination against blacks in municipal employment and the dispensing of municipal services; (3) a history of official discrimination against blacks in Alabama; and (4) the mechanics of the at-large system, including a majority vote requirement.

**5.** In addition to the allegations in its Complaint, see text at p. 1068, *supra,* plaintiff relied upon the recent rejection of a preferential referendum to change the Commission form of government, annexations which increased the numbers of white voters, and an alleged disparity in municipal services afforded to black and white neighborhoods.

**6.** The Supreme Court's language in *Bolden,* upon which the District Court relied, condemns a system "conceived *or* operated as a purposeful device to further discrimination." Thus, even if an electoral system is enacted innocently, it may be maintained invidiously resulting in racial discrimination.

electing a county Board of Commissioners under the Fourteenth Amendment.[7] Although Justice White, writing for the majority, did not overrule *Bolden,* the Court's decision in *Rogers* clearly represents a retreat from the plurality's views in that case.

The Supreme Court in *Rogers* first noted that the lower courts had correctly anticipated the intent standard set forth in *Bolden.* 102 S.Ct. at 3277–78. The courts below concluded that although the at-large system was racially neutral when it was adopted, it was being maintained for invidious purposes." *Lodge v. Buxton,* No. 78–3241, slip op. at 4 (S.D.Ga.1978). Emphasizing the deference to be accorded the District Court's findings of fact, particularly regarding issues of intent, the majority held that the District Judge's determination that the electoral system in Burke County was being maintained for discriminatory purposes was not clearly erroneous. 102 S.Ct. at 3278–79.

In marked contrast to the plurality opinion in *Bolden* where the various *Zimmer* factors relied upon by the lower courts were singled out and discredited, the Court in *Rogers* enumerated the lower courts' findings consisting largely of *Zimmer* factors, and endorsed a "totality of the circumstances" approach to the question of discriminatory intent. *Id.* at 3279–81. The Court concluded that the District Court had based its finding of discriminatory intent primarily on the existence of *Zimmer* factors, but found this acceptable because the Court had not limited its inquiry to such factors. *Id.* at 3278. The majority then upheld the combined significance of the following evidence relied upon by the courts below as evincing a discriminatory purpose in the maintenance of an at-large system: (1) although blacks constituted a substantial majority of the county's population, they were a distinct minority of the registered voters; (2) the existence of bloc voting along racial lines coupled with the fact that no black candidate had ever been elected to the

Board of Commissioners; (3) low black voter registration, attributable to pre-Voting Rights Act discrimination in the form of literacy tests, poll taxes, white primaries, and educational discrimination; (4) exclusion from the political processes generally as evidenced by past discrimination in democratic party affairs and primaries, selection of grand juries, hiring of county employees, and appointments to county-wide boards and committees; (5) unresponsiveness and insensitivity on the part of elected officials toward the needs of the black community, as evidenced by discriminatory paving of roads, a reluctance to remedy complaints of school segregation and grand jury segregation, and the Commissioner's role in the incorporation of an all-white private school; and (6) the depressed socio-economic status of blacks in Burke County attributable at least in part to inferior education, and employment and housing discrimination. *Id.* at 3279–81.

The Court in *Rogers* also approved the evidentiary value of various characteristics of an at-large system which may enhance the denial of access to the political process, specifically, the large geographic size of the county, the majority vote provision, the requirement that candidates run for a specific seat, and the lack of any residency restrictions on candidates. *Id.* at 3280–81.

*Rogers v. Lodge* restores the significance of circumstantial evidence in determining whether a discriminatory purpose underlies the maintenance of an at-large system. Whereas *Bolden* appeared to require some direct evidence of discriminatory intent, 446 U.S. at 74, fn. 21, 100 S.Ct. at 1503, fn. 21, *Rogers* recognizes that circumstantial evidence may, in some cases, be insufficient. Provided a court considers the existence of *Zimmer* criteria as merely evidence of discriminatory intent, rather than the ultimate issue to be determined, it may properly base a finding of discriminatory purpose upon such factors. Also, a court clearly should

---

7. Although the Complaint in *Rogers* was also brought under the Voting Rights Act of 1965 and the Thirteenth and Fifteenth Amendments, the Supreme Court in *Rogers* did not address these claims, presumably because its decision in *Bolden* foreclosed such avenues absent an allegation of actual interference with the registration or voting processes.

not *limit* its inquiry to such evidence. Finally, *Rogers* indicates that the trier of fact is to be afforded broad discretion in applying this "totality of the relevant facts" approach to the question of discriminatory intent.

█ As we have indicated above, the District Court relied heavily on the plurality opinion on *Bolden* and its rejection of *Zimmer* factors in granting the appellee's Motion for Summary Judgment. It is also apparent that in opposing the Motion, the appellants sought to satisfy *Bolden's* ostensible requirement that a plaintiff furnish direct evidence of discriminatory intent. At the time of the District Court's decision, the plurality's decision in *Bolden* was the controlling authority in this area. The trial court's reliance upon it was entirely proper. No court is charged with an obligation to anticipate a subsequent retreat from existing decisions. This Court, however, has had the benefit of the Supreme Court's decision in *Rogers v. Lodge, supra.* Because we believe that the majority's decision in *Rogers* represents a significant departure from the plurality's opinion in *Bolden* as to the appropriate inquiry in a vote dilution case, we conclude that this case should be returned to the District Court for consideration in light of *Rogers v. Lodge, supra.* In doing so, however, we intimate no opinion whatsoever on the sufficiency of the allegations in the Complaint if proven, the evidence now present in the record, or the decision the District Court should reach. The question of whether an electoral system is being maintained for a discriminatory purpose "demands a sensitive inquiry into such circumstantial direct evidence as may be available," and is best left in the first instance to the trier of fact. *Rogers v. Lodge, supra* at 3276, *quoting Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

On June 29, 1982, Congress amended Section 2 of the Voting Rights Act of 1965. Prior to its amendment, the Supreme Court had held that Section 2 merely tracked the Fifteenth Amendment. *City of Mobile v. Bolden,* 446 U.S. at 61, 100 S.Ct. at 1496 (1980). Accordingly, in order to establish a violation of the statute, a plaintiff was formerly required to show both discriminatory intent and a direct interference with the right to register or vote. *Id.* at 61–65, 100 S.Ct. at 1496–1498. Amended Section 2, however, now provides as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner *which results* in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973 b(f)(2) of this title, as provided in subsection (b) of this section. (emphasis added).

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protection by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered. *Provided,* that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population. (emphasis in original).

The Senate Report makes it clear that the amendment to Section 2 of the Voting Rights Act is intended "to restore the legal standard that governed voting discrimination cases prior to the Supreme Court's decision in *Bolden*." Sen.Rep. No. 97–417 at pp. 2, 15; U.S.Code Cong. & Admin.News 1982, p. 177, 179. The report goes on to summarize that state of the law as follows:

In pre-*Bolden* cases plaintiffs could prevail by showing that a challenged election

law or procedure, in the context of the total circumstances of the local electoral process, had the result of denying a racial or language minority an equal chance to participate in the electoral process. Under this results test, it was not necessary to demonstrate that the challenged election law or procedure was designed or maintained for a discriminatory purpose. U.S.Code Cong. & Admin.News 1982, p. 193.

Finally, the legislative history lists "typical factors" which Congress contemplated a court might properly consider in determining whether there is a violation of the amended Act. These factors are:

(1) The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

(2) The extent to which voting in the elections of the state or political subdivision is racially polarized;

(3) The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

(4) If there is a candidate slating process, whether the members of the minority group have been denied access to that process.

(5) The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such area as education, employment and health, which hinder their ability to participate effectively in the political process;

(6) Whether political campaigns have been characterized by overt or subtle racial appeals;

(7) The extent to which members of the minority group have been elected to public office in the jurisdiction. U.S.Code Cong. & Admin.News 1982, p. 206.

Clearly, the amended Voting Rights Act shifts the focus of a vote dilution claim under the statute to a discriminatory "effect" or "result" as opposed to motive or intent. Although examination of the plaintiffs' Complaint in this case reveals that the plaintiffs have never proceeded under the Voting Rights Act of 1965, 42 U.S.C. § 1973 *et seq.,* our prior decision to remand this case on constitutional grounds suggests that plaintiffs should also be given the opportunity to amend their Complaint to state a claim under the amended Voting Rights Act. Appellees' contention that the Voting Rights Act of 1965 is inapplicable because Tennessee has never been subject to the provisions of Section 4 of the Act, 42 U.S.C. § 1973b, is simply incorrect. Although the provisions of Section 4 apply only to states which had previously utilized discriminatory tests and devices, Section 2 of the Act contains a general prohibition of discriminatory practices which operates nationwide. Plaintiffs are therefore entitled to proceed under Section 2 of the Act. Again, however, we express no view as to the merits of any claim plaintiffs may assert under the amended Voting Rights Act.

The judgment of the District Court is hereby VACATED and REMANDED for consideration in light of *Rogers v. Lodge* and the Voting Rights Act of 1965, 42 U.S.C. § 1973 *et seq.*