David JORDAN and Sammie Chestnut, on behalf of the Greenwood Voters League, Individually and on behalf of others similarly situated, Plaintiffs,

v.

William WINTER, Governor of Mississippi; T.H. Campbell, III, Chairperson, Bill Harpole, Vice-Chairperson, J.C. "Con" Maloney, Secretary, and their successors in office, Joint Congressional Redistricting Committee; Brad Dye, Lieutenant Governor of Mississippi and President of the Senate; and Clarence B. "Buddie" Newman, Speaker of the House of Representatives, Defendants.

Owen H. BROOKS, Sarah H. Johnson, Rev. Harold R. Mayberry, Willie Long, Robert E. Young, Thomas Morris, Charles McLaurin, Samuel McCray, Robert Jackson, Rev. Carl Brown, June E. Johnson, and Lee Ethel Henry, individually and on behalf of others similarly situated, Plaintiffs,

v.

William F. WINTER, Governor of Mississippi; Edwin L. Pittman, successor in office to William A. "Bill" Allain, Attorney General of Mississippi; Dick Molpus, successor in office to Edwin Lloyd Pittman, Secretary of State of Mississippi, in their official capacities and as members of the Mississippi State Board of Election Commissioners; State Board of Election Commissioners, Mississippi Democratic Executive Committee, Mississippi Republican Executive Committee, Defendants.

Civ. A. Nos. GC 82–80–WK–0, GC 82–81–WK–0.

United States District Court, N.D. Mississippi, Greenville Division.

April 16, 1984.

Frank R. Parker, Patricia Hanrahan, Sidney Bixler, Lawyers' Committee for Civil Rights Under Law, Washington, D.C., Johnnie E. Walls, Jr., Greenville, Miss., Robert B. McDuff, University, Miss., for plaintiff O.H. Brooks.

Alvin O. Chambliss, North Miss. Rural Legal Services, Oxford, Miss., Willie Perkins, North Miss. Rural Legal Services, Greenwood, Miss., for plaintiffs D. Jordan.

Edwin L. Pittman, Atty. Gen. of Miss., Jackson, Miss., Jerris Leonard, Kathleen Heenan McGuan, Washington, D.C., Hubbard T. Saunders, IV, Champ Terney, R. Scott Levanway, Jackson, Miss., for State defendants.

Danny E. Cupit, pro se.

Michael B. Wallace, Jackson, Miss., for Republican defendants.

Before CLARK, Chief Circuit Judge, SENTER, Chief District Judge, and KEADY, Senior District Judge.

## ON REMAND FROM THE UNITED STATES SUPREME COURT

PER CURIAM.

On June 8, 1982, this court ordered into effect on an interim basis a congressional redistricting plan for the State of Mississippi. *Jordan v. Winter*, 541 F.Supp. 1135, 1144–45 (N.D.Miss.1982). On appeal, the United States Supreme Court vacated this court's judgment and remanded the case for further consideration in light of Section 2 of the Voting Rights Act of 1965, 461 U.S. 921, 103 S.Ct. 2077, 77 L.Ed.2d 291 (1983).

This court held an evidentiary hearing in December of 1983. On the basis of the evidence adduced at trial and the pleadings, briefs, and argument of counsel, we concluded that the court-ordered plan, or Simpson Plan, violated amended § 2. The court found that the structure of the Second Congressional District in particular unlawfully diluted black voting strength. Accordingly, on January 6, 1984, we entered judgment directing the use, until the Mississippi Legislature enacts a valid congressional redistricting plan, of an interim plan fashioned by the court with the aid of the parties. Pursuant to the reservation set out in that final judgment, we now enter Findings of Fact and Conclusions of Law in support of that judgment, in conformity with Fed.R.Civ.P. 52(a).

### I. *Procedural History*

The history of the legislative and judicial efforts to secure a constitutional congressional redistricting plan for the State of Mississippi is set out in our prior decision in *Jordan v. Winter*, 541 F.Supp. 1135 (N.D. Miss.1982). Only a brief summary is required here.

The 1980 official census revealed a total population disparity in Mississippi's 1972 congressional districting plan of 17.6%. Recognizing the constitutional problem

posed by such malapportionment, *see* U.S. Const. Art 1, § 2; *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the Mississippi Legislature in 1981 enacted S.B. 2001[1] for redistricting the state's five congressional districts. The Attorney General of the United States, after reviewing the plan pursuant to the preclearance provisions of Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c,[2] interposed a timely objection on March 30, 1982. The Attorney General found the plan defective because it divided the concentration of black majority counties located in the northwest or "Delta" portion of the state among three districts rather than concentrating them in a single district.[3] He concluded that this configuration constituted an unlawful dilution of minority voting strength.

The Mississippi Legislature did not attempt to enact another plan or otherwise to obtain preclearance from the Attorney General. On April 7, 1982, it filed a declaratory judgment action in the United States District Court for the District of Columbia seeking judicial preclearance of S.B. 2001. *Mississippi v. Smith,* No. 82–0956. That action has since been voluntarily dismissed.

The Jordan and Brooks plaintiffs then filed class actions to enjoin enforcement of S.B. 2001 until it was precleared, to prohibit further use of the 1972 plan because of population malapportionment, and to secure a court-ordered interim plan for the 1982 congressional elections and thereafter until changed by law. A three-judge district court was convened pursuant to 28 U.S.C. § 2284. Jurisdiction was based on 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1973j(f). This court declined to place the unprecleared S.B. 2001 into effect on an interim basis and concluded that the 1972 plan was unconstitutionally malapportioned and therefore also unsuitable for interim use. *Jordan v. Winter,* 541 F.Supp. at 1142. It thus limited its consideration to two plans advocated by the plaintiffs and one advocated by the AFL–CIO as amicus curiae.

Plaintiffs urged the court to order into effect either of two plans devised by Senator Henry J. Kirksey, a black state legislator. Both plans kept the Delta area intact and achieved black majority districts by combining the Delta area with predominantly black portions of Hinds County and the City of Jackson. 541 F.Supp. at 1140. Plaintiffs' preferred plan (Kirksey Plan 1) contained one district that was 64.37% black; the alternative plan (Kirksey Plan 2) contained one district that was 65.81% black. *Id.* The plan urged by the AFL–CIO, the "Simpson Plan," combined fifteen Delta and part-Delta counties with six predominantly white eastern rural counties to produce four majority white districts and one district with a black population majority of 53.77%. *Id.* at 1141. The Kirksey Plan 1 had a total population variance of .2150%; the Kirksey Plan 2 a variance of .230%, and the Simpson plan a variance of .2141%.

The court was bound by *Upham v. Seamon,* 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982), to fashion an interim plan that adhered to the state's political policies to the extent those policies did not violate the Constitution or the Voting Rights Act. 541 F.Supp. at 1141. The court determined that the following political policies underlay the passage of S.B. 2001:

1. 1981 Mississippi Laws (Extraordinary Sess.) Ch. 8.

2. Mississippi is a covered jurisdiction under § 5 of the Voting Rights Act, and S.B. 2001 was a change in voting standards, practices, or procedures within the meaning of § 5.

3. The Mississippi Delta consists of the following counties: Bolivar, Carroll, Coahoma, DeSoto, Grenada, Holmes, Humphreys, Issaquena, Leflore, Panola, Quitman, Sharkey, Sunflower, Tallahatchie, Tate, Tunica, Warren, Washington, and Yazoo. Mississippi's congressional districting plans from 1882 to 1966 all contained a district encompassing most of the Delta counties. 541 F.Supp. at 1139 and n. 2. Maps depicting the congressional districts as they existed under the 1962 plan and under S.B. 2001 are attached. District 2 of the 1962 plan contains most of the Mississippi Delta.

(1) Minimal change from 1972 district lines; (2) least possible population deviation; (3) preservation of the electoral base of incumbent congressmen; and (4) establishment of two districts with 40% or better black population.

*Id.* at 1143. Because the Simpson Plan most nearly accorded with the latter three policies, which the court found to be constitutionally and statutorily valid,[4] we ordered it into effect on an interim basis. That plan was used for the 1982 congressional elections. It is depicted on a map appended to our prior decision, *id.* at 1146, and is statistically described as follows:

| District | Total Population | Deviation | %Deviation | %Black |
|---|---|---|---|---|
| 1 | 504,671 | +543 | +.1077 | 25.86 |
| 2 | 504,697 | +569 | +.1128 | 53.77 |
| 3 | 503,760 | −368 | −.0729 | 31.23 |
| 4 | 503,893 | −235 | −.0466 | 45.25 |
| 5 | 503,617 | −511 | −.1013 | 19.84 |

Although the Second District under the Simpson Plan was a majority black district (53.77%), it had a minority black voting age population of 48.05%.

Analysis of the Simpson Plan under the standard established is amended § 2 of the Voting Rights Act of 1965 reveals its invalidity.

II. *Amended Section 2*

■ Section 2 of the Voting Rights Act of 1965, as amended, presently reads:

Sec. 2(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement .of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

(b) a violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C.A. § 1973 (West Supp.1983). The amendment to Section 2 was designed to eliminate the requirement, prescribed in *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), that a plaintiff demonstrate intentional discrimination to establish a violation of section 2.[5]

---

4. As to the first policy, the court recognized that the validity of the Attorney General's conclusion that drawing lines for Districts 1, 2, and 3 from east to west unlawfully diluted black voting strength was the primary issue in the proceedings then pending in the District Court of the District of Columbia. It therefore accepted, without indicating any view as to its validity, the Attorney General's conclusion. 541 F.Supp. at 1143.

5. S.1992 amends Section 2 of the Voting Rights Act of 1965 to prohibit any voting practice, or procedure [which] results in discrimination. This amendment is designed to make clear that proof of discriminatory intent is not required to establish a violation of Section 2. . . .
S.Rep. No. 417, 97th Cong.2d Sess. 2, *reprinted in* 1982 U.S.Code Cong. & Ad.News 177, 179

(hereinafter cited as Senate Report). *See Jones v. City of Lubbock,* 727 F.2d 364 (5th Cir.1984); *Jordan v. City of Greenwood,* 711 F.2d 667, 668–69 (5th Cir.1983); *Buchanan v. City of Jackson,* 708 F.2d 1066, 1072 (6th Cir.1983); *Campbell v. Gadsden County School Board,* 691 F.2d 978, 981, n. 4 (11th Cir.1982); *Seamon v. Upham,* 563 F.Supp. 396 (E.D.Tex.1983); *Major v. Treen,* 574 F.Supp. 325, 342 (E.D.La.1983); Blumstein, Defining and Proving Race Discrimination: *Perspectives on the Purpose v. Results Approach from the Voting Rights Act,* 69 Va.L.Rev. 633, 689–70 (1983); Hartman, *Racial Vote Dilution and Separation of Powers: An Exploration of the Conflict Between the Judicial "Intent" and the Legislative "Results" Standards,* 50 Geo.Wash.L. Rev. 689, 726 (1982).

The Republican Defendants have argued that amended Section 2 preserves the requirement of

■ We reject the contention of the Republican Defendants that Section 2, if construed to reach discriminatory results, exceeds Congress's enforcement power under the fifteenth amendment. We agree with the analysis and conclusion set out in *Major v. Treen*, 574 F.Supp. 325, 342–349 (E.D.La.1983) (three judge court), which rejected a similar assault on the constitutionality of Section 2. We therefore adopt that treatment of this issue without repetition here.

The Senate Judiciary Report on the amendment states that the "results" language of new Section 2 was meant to "restore the pre-[*City of Mobile v.*] *Bolden* legal standard which governed cases challenging electoral systems or practices as an illegal dilution of the minority vote." Senate Report at 27, U.S.Code Cong. & Admin. News 1982, p. 205. The Report then enumerates the factors courts should consider in deciding whether plaintiffs have established a violation of Section 2. These factors, derived from the Supreme Court's opinion in *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), as applied in this Circuit in *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir.1973) (en banc), *aff'd on other grounds sub. nom East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), include, but are not limited to:

1. The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. The extent to which voting is racially polarized;

3. The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. If there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. Whether political campaigns have been characterized by overt or subtle racial appeals;

7. The extent to which members of the minority group have been elected to public office in the jurisdiction.

Senate Report at 28–29, U.S.Code Cong. & Admin.News 1982, p. 206 (footnotes omitted). The Report also cites for consideration, as additional factors probative of a violation of Section 2: (1) whether elected officials are unresponsive to the needs of minority group members; and (2) whether the policy underlying the challenged procedure is "tenuous." *Id.* at 29, U.S.Code Cong. & Admin.News 1982, p. 207. No particular number of these factors need be proved. *Id.*

### III. *Amended Section 2 and the Simpson Plan*

■ The court finds that the aggregate of the following factors shows that the Simpson Plan unlawfully dilutes minority voting strength.

### A. *Past Discrimination*

That Mississippi has a long history of de jure and de facto race discrimination is not contested. That history has been often recounted in judicial decisions [6] and in-

---

proving discriminatory intent. We find this argument to be meritless as it runs counter to the plain language of amended § 2, its legislative history, and judicial and scholarly interpretation.

**6.** *See, e.g., United States v. Mississippi*, 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965); *Kirksey v. Board of Supervisors*, 554 F.2d 139, 144 (5th Cir.1977); *Moore v. Leflore County Board of Election Commissioners*, 502 F.2d 621, 624 (5th Cir.1974), *aff'g* 361 F.Supp. 603, 605 (N.D.Miss.

cludes the use of such discriminatory devices as poll taxes, literacy tests, residency requirements, white primaries, and the use of violence to intimidate blacks from registering for the vote. The State is a covered jurisdiction under the Voting Rights Act of 1965. The Attorney General has designated 42 of the counties in Mississippi for federal registrar enforcement of the right to vote.

We find that the effects of the historical official discrimination in Mississippi presently impede black voter registration and turnout. Black registration in the Delta area is still disproportionately lower than white registration. No black has been elected to Congress since the Reconstruction period, and none has been elected to statewide office in this century. Blacks hold less than ten percent of all elective offices in Mississippi, though they constitute 35% of the state's population and a majority of the population of 22 counties.

The evidence of socio-economic disparities between blacks and whites in the Delta area and the state as a whole is also probative of minorities' unequal access to the political process in Mississippi.[7] Blacks in Mississippi, especially in its Delta region, generally have less education, lower incomes, and more menial occupations than whites. The State of Mississippi has a history of segregated school systems that provided inferior education to blacks. *See* United States Commission on Civil Rights, *Voting in Mississippi*, pp. 3–4 (1965). Census statistics indicate lingering effects of this past discrimination: the median family income in the Delta Region (Second District) for whites is $17,467, compared to $7,447 for blacks; more than half of the adult blacks in the Second District have attained only 0 to 8 years of schooling, while the majority of white adults in this District have completed four years of high school; the unemployment rate for blacks is two to three times that for whites; and blacks generally live in inferior housing.

### B. *Racial Bloc Voting*

Plaintiffs have established that voters in Mississippi have previously voted and continue to vote on the basis of the race of candidates for elective office. The state defendants had conceded as much prior to the 1982 elections, but attempted to show at trial that the 1982 campaign in the Second District was not characterized by racial bloc voting. The evidence defendants presented was that the black Democratic candidate, Robert Clark, received approximately 15% of the white vote in the 1982 general election and that Clark won the Democratic nomination in a primary contest against white opponents. The primary election in the Second District conducted under our prior plan was characterized by confusion and low voter turnout due to a variety of factors, including uncertainty about election dates, the recent realignment of the district, and the lack of an incumbent. The race was additionally atypical because of a court order allowing Republican voters to participate in the Democratic primary. Clark's victory in the primary was followed by defeat in the general election—a defeat we find was caused in part by racial bloc voting. Plaintiffs' proof, also based on analysis of these election returns, demonstrated a consistently high degree of racially polarized voting in the 1982 election and previous elections. From all of the evidence, we conclude that blacks consistently lose elections in Mississippi because the majority of voters choose

1972); *Mississippi v. United States*, 490 F.Supp. 569, 575 (D.D.C.1979), *aff'd*, 444 U.S. 1050, 100 S.Ct. 994, 62 L.Ed.2d 739 (1980).

7. The courts have recognized that disproportionate education, employment, income level and living conditions arising from past discrimination tend to depress minority political participation, e.g. *White [v. Regester]*, 412 U.S. at 768, [93 S.Ct. at 2340]; *Kirksey v. Board of Supervisors*, 554 F.2d 139, 145 [ (5th Cir.

1977) ]. Where these conditions are shown, and where the level of black participation in politics is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation.
Senate Report No. 417, 97th Congress 2d Sess. at 29, n. 114, U.S.Code Cong. & Admin.News 1982, p. 207.

their preferred candidates on the basis of race. We therefore find racial bloc voting operates to dilute black voting strength in Congressional districts where blacks constitute a minority of the voting age population. Since the Second District under the Simpson Plan does not have a majority black voting age population, the presence of racial bloc voting in that district inhibits black voters from participating on an equal basis with white voters in electing representatives of their choice. As the Supreme Court held in *Rogers v. Lodge*, 458 U.S. 613, 623, 102 S.Ct. 3272, 3279, 73 L.Ed.2d 1012 (1982):

> Voting along racial lines allows those elected to ignore black interests without fear of political consequences, and without bloc voting the minority candidates would not lose elections solely because of their race.

## C. *The State Policies Underlying the Simpson Plan*

This court previously adopted the Simpson Plan for interim use primarily because it conformed to the State legislature's policy of favoring the division of the black population of the State into two "high impact" districts rather than concentrating it into one district. 541 F.Supp. at 1143–44. The results test required by Section 2 precludes dependence on this policy. The combination of six predominantly white eastern counties with the Delta region's black population, when considered in light of the effects of past discrimination on black efforts to participate in political affairs and the existence of racially polarized voting, operated to minimize, cancel, or dilute black voting strength in the Second District. *Kirksey v. Board of Supervisors*, 554 F.2d at 150; *see Major v. Treen*, 574 F.Supp. at 354; Hartman, *Racial Vote Di-*

*lution and Separation of Powers; An Exploration of the Judicial "Intent" and the Legislative "Results" Standards,* 50 Geo. Wash.L.Rev. 689, 695 (1982). Our previous opinion relied on *United States v. Forrest County Board of Supervisors*, 571 F.2d 951 (5th Cir.1978), and *Wyche v. Madison Parish Police Jury*, 635 F.2d 1151 (5th Cir.1981). Neither involved evidence of racial bloc voting. They are no longer apposite.

## D. *Other Factors*

Plaintiffs produced other persuasive evidence that the political processes in Mississippi were not equally open to blacks. Evidence of racial campaign tactics used during the 1982 election in the Second District supports the conclusion that Mississippi voters are urged to cast their ballots according to race.[8] This inducement to racially polarized voting operated to further diminish the already unrealistic chance for blacks to be elected in majority white voting population districts.

## IV. *The Court-Ordered Interim Plan*

■ In devising a plan to replace our prior plan for the impending election, we recognized the obligation to: (1) achieve the least possible deviation from the one person, one vote ideal, *Chapman v. Meier*, 420 U.S. 1, 26–27, 95 S.Ct. 751, 765–66, 42 L.Ed.2d 766 (1975); (2) design a plan that is not racially discriminatory in either purpose or effect, *McDaniel v. Sanchez*, 452 U.S. 130, 148, 101 S.Ct. 2224, 2235, 68 L.Ed.2d 724 (1981); and (3) adhere to the state's policies except to the extent such policies are violative of either the Constitution or the Voting Rights Act, *Upham v. Seamon*, 456 U.S. 37, 102 S.Ct. 1518, 1520–21, 71 L.Ed.2d 725 (1982).

---

**8.** One campaign television commercial sponsored by the white candidate whose slogan was "He's one of us" opened and closed with a view of Confederate monuments accompanied by this audio message:

> You know, there's something about Mississippi that outsiders will never, ever understand. The way we feel about our family and God,

and the traditions that we have. There is a new Mississippi, a Mississippi of new jobs and new opportunity for all our citizens. [video pan of black factory workers] We welcome the new, but we must never, ever forget what has gone before. [video pan of Confederate monuments] We cannot forget a heritage that has been sacred through our generations.

The plan ordered into effect by our final judgment of January 6, 1984, meets these requirements. The statistics of that plan are set out below.

| Congressional District | Total Population | Percent Variance From the Norm | Black Population | %Black | Total Voting Age Pop. (VAP) | Black VAP | %Black VAP |
|---|---|---|---|---|---|---|---|
| 1 | 504,077 | −.0101% | 124,136 | 24.63% | 346,074 | 74,165 | 21.43% |
| 2 | 504,024 | −.0206% | 293,838 | 58.30% | 322,719 | 170,491 | 52.83% |
| 3 | 504,242 | +.0226% | 161,710 | 32.07% | 348,524 | 98,478 | 28.26% |
| 4 | 504,187 | +.0117% | 211,714 | 41.99% | 346,370 | 129,618 | 37.42% |
| 5 | 504,108 | −.0040% | 95,808 | 19.01% | 342,754 | 57,068 | 16.65% |

Range .0432

The interim plan was constructed under these criteria: create a rural Delta-River area district with a black voting age population majority; achieve minimal deviation from the ideal population per congressional district of 504,128; create districts containing voters with similar interests; preserve the electoral base of incumbents; and comply with the legislative goal of achieving high impact districts without splintering cohesive black populations.

■ We recognize that the creation of a Delta district with a majority black voting age population implicates difficult issues concerning the fair allocation of political power. See A. Howard & B. Howard, The Dilemma of the Voting Rights Act—Recognizing the Emerging Political Equality Norm, 83 Colum.L.Rev. 1615 (1983). Although the use of a race-conscious remedy for discrimination, approved by the Supreme Court in United Jewish Organizations v. Carey, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977), can come into tension with Congress' disclaimer in amended § 2 of any right to proportional representation, the plan we have adopted fully rectifies the dilution of black voting strength in the Second District and satisfies the requirements of amended § 2 without achieving proportional representation for blacks in Mississippi.

■ The court rejected alternative plans offered by plaintiffs which would achieve a significantly higher black voting age population (approximately 60%) in the Second District. Plaintiffs argue that a black voting age population of such preponderance is required for blacks to elect representatives of their choice. Amended § 2, however, does not guarantee or insure desired results, and it goes no further than to afford black citizens an equal opportunity to participate in the political process. In commenting upon the § 2 amendment, Senator Dole, a leading sponsor of the compromise legislation, stated: "Citizens of all races are entitled to have an equal chance of electing candidates of their choice, but if they are fairly afforded that opportunity and lose, the law should offer no remedies." Senate Report at 193, U.S.Code Cong. & Admin.News 1982, p. 364. In the opinion of this court, after considering the totality of the circumstances, the creation of a Second District with a clear black voting age population majority of 52.83% is sufficient to overcome the effects of past discrimination and racial bloc voting and will provide a fair and equal contest to all voters who may participate in congressional elections. Credible expert testimony received in this case supports this conclusion. Additionally, plaintiffs' plans are an obvious racial gerrymander which would bring into the Second District overwhelmingly black sections of the City of Jackson and its suburbs; these inner-city, metropolitan areas have little in common with the interests of the predominantly rural Delta region. Also, plaintiffs' plans unnecessarily dilute black voting strength in the Fourth District. The Fourth District presently has a black population of 45.25%. The evidence

presented indicates this is a factor in making the Fourth District representative reasonably receptive and sensitive to the needs of the black community. The plan adopted necessarily reduces the black population of the Fourth District to 41.99%. To further reduce the black population in the Fourth District to 33.7 or 33.83% as proposed by plaintiffs (541 F.Supp. at 1140) would diminish the impact of black voters in that district. Although the plans proposed by plaintiffs would probably insure the election of a black congressman in the Second District, the attempt to gain this election guaranty, which § 2(b) expressly disclaims, would have a certain adverse effect on the impact of the black voters in the Fourth District. Because of these considerations, we conclude that a black voting age population majority of 52.83% achieved under the court's plan will remedy the defect we now perceive in the *Simpson Plan* under the amended § 2.

We are cognizant that our court-ordered interim plan does not provide a compact geographical configuration for the Second District. However, it consists of rural Delta and river counties with similarities of interest; avoids gerrymandering a substantial portion of metropolitan Jackson into a district with these rural or farm counties; and yields the least adverse impact on the black voting influence in the Fourth District.

A specific description of the five congressional districts as established in our final judgment of January 6, 1984, and map outlining these districts, are attached.

APPENDIX

MISSISSIPPI
CONGRESSIONAL DISTRICTS
1962

MISSISSIPPI
CONGRESSIONAL DISTRICTS

SENATE BILL 2001

## CONGRESSIONAL DISTRICTS ESTABLISHED BY FINAL JUDGMENT OF JANUARY 6, 1984

The boundaries of all counties, supervisors' districts, and precincts listed below shall be such boundaries as they existed on July 1, 1981 (*see* 541 F.Supp. 1135 at 1145, N.D.Miss.1982), with the exception of the supervisors' districts and precincts referred to are those defined and incorporated in the Consent Judgment entered on October 26, 1983, by the United States District Court for the Southern District of Mississippi in Cause No. H–83–0200(R) styled Jones County Branch, NAACP v. Jones County, Mississippi.

**District No. 1** shall consist of the following whole counties:

| | | | |
|---|---|---|---|
| Alcorn | Itawamba | Montgomery | Tishomingo |
| Benton | Lafayette | Pontotoc | Union |
| Calhoun | Lee | Prentiss | Webster |
| Chickasaw | Marshall | Tate | Yalobusha |
| DeSoto | Monroe | Tippah | |

together with the following parts of counties:

| | |
|---|---|
| Choctaw County | All except for the Panhandle precinct; |
| Panola County | All except for the precincts of Crenshaw, Curtis, East Crowder, Longtown, Pleasant Grove, and South Curtis; |
| Tallahatchie County | All precincts located in Supervisors' Districts 1, 2, and 3. |

**District No. 2** shall consist of the following whole counties:

| | | | |
|---|---|---|---|
| Bolivar | Holmes | Leflore | Tunica |
| Carroll | Humphreys | Quitman | Warren |
| Claiborne | Issaquena | Sharkey | Washington |
| Coahoma | Jefferson | Sunflower | Yazoo |
| Grenada | | | |

together with the following parts of counties:

| | |
|---|---|
| Attala County | The precincts of McAdams, Newport, Sallis, Shrock, and Possumneck; |
| Hinds County | The precincts of Bolton, Brownsville, Cayuga, Chapel Hill, Dry Grove, Edwards, Learned, Pinehaven, Pocahontas, Raymond 1, Raymond 2, Tinnin, Utica 1, and Utica 2; |
| Madison County | All except the precinct of Ridgeland; |
| Panola County | The precincts of Crenshaw, Curtis, East Crowder, Longtown, Pleasant Grove, and South Curtis; |

| | |
|---|---|
| Tallahatchie County | All precincts located in Supervisors' Districts 4 and 5. |

**District No. 3** shall consist of the following whole counties:

| | | | |
|---|---|---|---|
| Clarke | Lauderdale | Newton | Scott |
| Clay | Leake | Noxubee | Smith |
| Jasper | Lowndes | Oktibbeha | Winston |
| Kemper | Neshoba | | |

together with the following parts of counties:

| | |
|---|---|
| Attala County | All except for the precincts of McAdams, Newport, Sallis, Shrock, and Possumneck; |
| Chocktaw County | The Panhandle precinct; |
| Jones County | All new precincts located in new Supervisors' Districts Nos. 1, 2, and 5; The new Blackwell precinct in new Supervisors' District No. 4; and All of new Supervisors' District 3 except the new precincts of Glade, Ovett, and Tuckers; |
| Madison County | The Ridgeland precinct; |
| Rankin County | All except for the precincts of Cato, Clear Branch, County Line, Dobson, Dry Creek, Johns, Mountain Creek, Puckett, and Star. |

**District No. 4** shall consist of the following whole counties:

| | | | |
|---|---|---|---|
| Adams | Franklin | Lincoln | Simpson |
| Amite | Jeff. Davis | Marion | Walthall |
| Copiah | Lawrence | Pike | Wilkinson |
| Covington | | | |

together with the following parts of counties:

| | |
|---|---|
| Hinds County | All except the precincts of Bolton, Brownsville, Cayuga, Chapel Hill, Dry Grove, Edwards, Learned, Pinehaven, Pocahontas, Raymond 1, Raymond 2, Tinnin, Utica 1, and Utica 2. |
| Rankin County | The precincts of Cato, Clear Branch, County Line, Dobson, Dry Creek, Johns, Mountain Creek, Puckett, and Star. |

**District No. 5** shall consist of the following whole counties:

| | | | |
|---|---|---|---|
| Forrest | Hancock | Lamar | Stone |
| George | Harrison | Pearl River | Wayne |
| Greene | Jackson | Perry | |

together with the following parts of counties:

| | |
|---|---|
| Jones County | All new precincts in new Supervisors' District 4 except the new Blackwell Precinct; and In new Supervisors' District 3, the new precincts of Glade, Ovett, and Tuckers. |

The statistics for each of the five congressional districts defined above are as follows:

| Congressional District | Total Population | Percent Variance from the Norm | Black Population | % Black | Total Voting Age Pop. (VAP) | Black VAP | % Black VAP |
|---|---|---|---|---|---|---|---|
| 1 | 504,077 | −.0101% | 124,136 | 24.63% | 346,074 | 74,165 | 21.43% |
| 2 | 504,024 | −.0206% | 293,838 | 58.30% | 322,719 | 170,491 | 52.83% |
| 3 | 504,242 | +.0226% | 161,710 | 32.07% | 348,524 | 98,478 | 28.26% |
| 4 | 504,187 | +.0117% | 211,714 | 41.99% | 346,370 | 129,618 | 37.42% |
| 5 | 504,108 | −.0040% | 95,808 | 19.01% | 342,754 | 57,068 | 16.65% |

Range .0432

MISSISSIPPI
CONGRESSIONAL DISTRICTS

FINAL JUDGMENT
JANUARY 6, 1984