**Howard GUNN, et al., Plaintiffs,**

v.

**CHICKASAW COUNTY, MISSISSIPPI, By and Through the PRESIDENT OF the CHICKASAW COUNTY, MISS. BOARD OF SUPERVISORS, Chairperson, Jerry Hancock; Chickasaw County Democratic Executive Committee; Chickasaw County Republication Executive Committee and Chickasaw County Election Commission, Defendants.**

**Civ. A. No. EC 87–165–D–D.**

United States District Court, N.D. Mississippi, E.D.

Jan. 24, 1989.

Ellis Turnage, Cleveland, Miss., for plaintiffs.

John P. Fox, Houston, Miss., for County and Bd. of Sup'rs.

James M. Hood, Jr., Houston, Miss., for Democratic Committee.

## MEMORANDUM OPINION

DAVIDSON, District Judge.

### I. Introduction

This class action challenges the validity of Chickasaw County, Mississippi's 1983 redistricting plan as it pertains to the election of the County Board of Supervisors and the Board of Election Commissioners. Both plaintiffs and defendants have submitted alternative plans for consideration in the event that the court should find the current plan to be invalid. Plaintiffs proceed under Section 2 et seq. of the Voting Rights Act of 1965, as amended, codified at 42 U.S.C. § 1973 et seq., and also the Fourteenth and Fifteenth Amendments to the Constitution, and 42 U.S.C. § 1983. Plaintiffs' allegations track the language of Section 2, and additionally allege that the violation was intentional. As the court finds that the 1983 redistricting plan, currently in force in Chickasaw County, violates Section 2 of the Voting Rights Act, the court does not reach plaintiffs' other claims. See *Thornburg v. Gingles*, 478 U.S. 30, 38, 106 S.Ct. 2752, 2760, 92 L.Ed.2d 25, 38–39 (1986).

### II. Findings of Fact

#### A. *Generally*

Chickasaw County encompasses 506 square miles in North Mississippi, and includes four separate incorporated municipalities, including two county seats, Houston and Okolona. The two other incorporated municipalities are Houlka and Woodland. The total population of Chickasaw County, according to the 1980 census, as amended to June 3, 1982, is 17,851; there are 6,444 black citizens, 11,371 white citizens and 36 citizens of other races. Blacks make up 36.10 percent of the county's total population and over 31 percent of the voting age population. The current districting

plan was drafted by Michelle Johnstone, a demographer who operates a private consulting firm. On January 3, 1983, after public hearings, the plan was adopted by the Board of Supervisors. The plan was precleared, pursuant to Section 5 of the Voting Rights Act, by the United States Attorney General's office on August 26, 1983, and was put into effect later that year. That plan creates five supervisory districts, with the following racial compositions:

| District | Total Population | All Non–Black | White | Other | Black | Percent Black |
|---|---|---|---|---|---|---|
| 1 | 3,482 | 2,611 | 2,595 | 16 | 871 | 25.01 |
| 2 | 3,713 | 2,205 | 2,202 | 3 | 1,508 | 40.61 |
| 3 | 3,657 | 2,243 | 2,233 | 10 | 1,414 | 38.67 |
| 4 | 3,512 | 2,015 | 2,013 | 2 | 1,497 | 42.63 |
| 5 | 3,487 | 2,333 | 2,328 | 5 | 1,154 | 33.09 |

As listed in the preclearance presentation submitted to the Attorney General, the objections and criteria for the current reapportionment were:

1. *Equality of Population* as required by state law and judicial precedent.

2. *Non-dilution* of minority and political element voting strength.

3. *Equality* of length of road and bridge mileage among the districts.

4. *Contiguity and compactness* of districts.

5. *The least possible disruption* of present taxing districts, voting precincts, polling places, and administration of voting changes.

6. *State law* requiring that newly drawn lines must follow natural boundaries; and other appropriate state statutes.

Ms. Johnstone further testified at trial that consideration was given to keeping cohesive groups together. She explained also that voters often had trouble understanding changes in their districts, and so she attempted, in drafting the plan, to keep voters in the same district if possible. She did not hold the maximization of black voting strength as a high priority, though she actively attempted to avoid diluting pre-existing black voting strength.

## B. *The "Typical Factors"*

In *Thornburg v. Gingles*, 478 U.S. 30, 36–37, 106 S.Ct. 2752, 2759–2760, 92 L.Ed. 2d 25, 38 (1986), the Supreme Court set out the "typical factors" which may be proba-tive of a violation of Section 2 of the Voting Rights Act, and identified in the Senate Judiciary Committee's Majority Report which accompanied the Bill that amended the Voting Rights Act. The report had identified seven primary factors and two additional factors, but cautioned that "[w]hile these enumerated factors will often be the most relevant ones, in some cases other factors will be indicative of the alleged dilution." S.Rep. No. 97–417, 97th Cong. 2 Sess. 28–29, *reprinted in* 1982 U.S.Code Cong. and Ad.News 177, 206–07. "[T]here is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Gingles*, at 45, 106 S.Ct. at 2764, 92 L.Ed.2d at 43 (quoting Report). The factors are:

(1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

(2) the extent to which voting in the elections of the state or political subdivision is racially polarized;

(3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

(4) if there is a candidate-slating process, whether the members of the minority

group have been denied access to that process;

(5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

(6) whether political campaigns have been characterized by overt or subtle racial appeals;

(7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group,

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard practice or procedure is tenuous.

*Id.*

The court's consideration of these factors is in the nature of findings of fact; after considering the evidence within the formal framework of these factors, the court must apply the "totality of the circumstances" test set forth in Section 2(b). The question to be considered is whether "the political processes leading to nomination or election ... are not equally open to participation by members of a [protected class] ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." Voting Rights Act § 2(b), 42 U.S.C. § 1973.

■ Finally, there are three limitations placed on the flexible test propounded in Section 2.

First, electoral devices, such as at-large elections, may not be considered per se violative of Section 2. Plaintiffs must demonstrate that, under the totality of the circumstances, devices result in unequal access to the electoral process. Second, the conjunction of an allegedly diluted electoral mechanism and the lack of proportional representation alone does not establish a violation. Third, the results test does not assume the existence of racial bloc voting; plaintiffs must prove it.

*Gingles*, at 46, 106 S.Ct. at 2764, 92 L.Ed. 2d at 44. (Citations omitted). As a preliminary matter, the court must address several elements of plaintiffs' case. First, the plaintiff class must have demonstrated that it is sufficiently numerically large and geographically compact to constitute a single member district that has been split between two or more multi-member or single-member districts, with the effect of diluting the potential strength of the minority vote. *Gingles*, at 50, n. 16 and 17, 106 S.Ct. at 2766, n. 16 and 17, 92 L.Ed.2d at 46. The court finds that plaintiffs have established this element, with help from the defendants. Both plaintiffs and defendants have submitted plans whereby Chickasaw County would be redistricted to produce two or one majority black districts, respectively. Regarding defendants' proposed plan, defendants have stated: "The proposed plan appears to be feasible and will be adopted, subject to approval by the Justice Department as provided by law." Defendants' Proposed Findings of Fact and Conclusions of Law at 7. The court is convinced that at least one redistricting plan is possible which would create at least one majority black district.

"Second, the minority group must be able to show that it is politically cohesive." *Gingles*, at 51, 106 S.Ct. at 2767, 92 L.Ed.2d at 47. "Third, the minority must be able to demonstrate that the white majority vote sufficiently as a block to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." *Id.* (Citations omitted). These last two elements are complementary aspects of racial bloc voting. Racial bloc voting "exists where there is 'a consistent relationship between the race of the voter and the way in which the voter

votes', or to put it differently, where 'black voters and white voters vote differently.'" *Gingles*, at 53, n. 21, 106 S.Ct. at 2768, n. 21, 92 L.Ed.2d at 48. Plaintiffs presented expert testimony on this issue, while the defendants presented none. Dr. Allan Lichtman presented his statistical analysis based on the county's election return tabulations [1], and of the census figures by precinct. Dr. Lichtman utilized the same two complementary methods of statistical analysis accepted first by the district court and then by the Supreme Court in *Gingles*, ecological regression analysis and extreme case analysis, and determined that there existed significant racial bloc voting among both blacks and whites. The results of this analysis are included in this opinion as appendix A. While these figures indicate the existence of some limited cross over voting, both by blacks and by whites, such cross over support is minimal. The figures indicate that, in Chickasaw County, "black voters and white voters vote differently."

A few black candidates have been successful in municipal elections in Chickasaw County. The court finds that this limited success does not negate plaintiffs' proof of polarized voting. No black person has been elected to either a district-wide or county-wide office.[2] The City of Okolona has a six-ward electoral scheme, pursuant to a special charter provision; two blacks have been elected to the Board of Aldermen, and are presently serving in that capacity. Each was elected from a ward with a majority black population. Prior to the implementation of the present districting scheme, Aldermen were elected at large for the City of Okolona. Under this at-large

system, one black, Mr. Prophette, was elected. Mr. Prophette's election does not indicate white cross-over support, as the City of Okolona has a 42.86 percent black population. The Okolona Municipal Separate School District has a five member Board of Trustees of which two members are black; one black Trustee fills an appointive position, and the other was appointed to fill out an unexpired term in one of the elective seats. In the City of Houston, under the court ordered four ward/one at-large election scheme now in place, one black alderman has been elected from a black majority ward. Further, there is one black member of the Houston Municipal Separate School District, who was elected in an uncontested election. None of these elections or appointments is probative of white cross-over voting; they do not rebut the plaintiffs' proof of white bloc voting.

Defendants also raise the success of black candidates in the majority white town of Woodland, Mississippi. The town utilizes an at-large voting scheme; two blacks have been elected and presently serve on the town's Board of Aldermen. No special factors have been shown to have contributed to this success. The success of these black citizens in the Town of Woodland is laudable, and is probative of white cross-over voting. It must be borne in mind, however, that with a population of 136, the Town of Woodland represents a minute portion of the population of Chickasaw County. The court finds that, despite the efforts of the people of Woodland, the white population of Chickasaw County, taken as a whole, or district by district, "votes

---

1. Chickasaw County does not keep registration records by the race of the voter. Dr. Lichtman's analysis relied on data from races involving a black candidate but did not include several races for which there was insufficient data from which to make statistically meaningful conclusions. Dr. Lichtman did not analyze races for which too few precincts, or "boxes", reported. Dr. Lichtman characterized the combined weight of the data analyzed as indicative of "extreme polarization", and stated that the pattern within the almost uniform data indicated virtually no possibility that the results were due to chance.

The court notes that it is unfortunately practical usually to consider only the success of

black candidates, though it is entirely likely that black voters have and will unite in support of non-black candidates.

2. Defendants in their proposed findings of fact and conclusions of law claimed that one black person served as a member of the county board of education. The court disregards this assertion because there is no evidence in the record of such. It is also instructive to note that the defendants do not state, as they have done where appropriate elsewhere in the same list, that the black official was elected to the position.

sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate." *Gingles*, at 51, 106 S.Ct. at 2767, 92 L.Ed.2d at 47.

The two most critical factors to be considered are "the extent to which minority group members have been elected to public office in the jurisdiction" and the "extent to which voting in the elections and the state political subdivision is racially polarized." *Gingles*, at 48, n. 15, 106 S.Ct. at 2766, n. 15, 92 L.Ed.2d 45. "If present, the other factors, such as the lingering effects of past discrimination, [and] the use of appeals to racial bias in election campaigns ... are supportive of, but *not essential* to, a minority voter's claim." *Id.* (emphasis in original). The court finds that plaintiffs have proven both of these factors.

This suit involves the delineation of the county's five supervisory districts, and specifically concerns the district elections for supervisor and election commissioner. To date, no black person has been elected to either position. There is no evidence of a successful black candidacy at the district level. The minimal political success of black candidates in other races is considered above. Further, as discussed above, the court finds an extreme degree of racial polarization in elections in Chickasaw County, a dramatic correlation between races in the way a voter votes.

As proscribed by Miss.Code Ann. Section 23-15-305, Chickasaw County has a majority voter requirement. Such a requirement has been identified as a practice which may enhance the opportunity for discrimination. S.Rep. No. 97-417, 97th Cong. 2 Sess. 28-29, *reprinted in* 1982 U.S.Code Cong. and Ad.News, 177, 206-07. Majority vote requirements are not *per se* violative of Section 2, but the existence of such a policy is noted here as a factor in the court's analysis.

Two other factors were also at issue in the instant case:[3] the extent of any history of official discrimination which has touched the right of minorities to vote, and the effects of discrimination in education, em-

ployment and health which hinder political participation by minority citizens. Plaintiffs have failed to prove a disproportionate level of black voter participation in Chickasaw County, an element necessary to these factors. Plaintiffs have offered convincing proof, by statistical analysis, raw census data, expert testimony and testimony of lay witnesses of the lingering effects of discrimination in employment, education, and housing. Plaintiffs have also moved this court for judicial notice of the history of official discrimination; as the court is unable to find current political detriment, it does not reach the motion for judicial notice.

The defendants rely on the estimates in the Census Bureau regarding the November 1984 elections. Those estimates, based on the responses of voters contacted, were that 85.6 percent of blacks and 81.4 percent of whites were registered to vote, and that 69.6 percent of blacks and 69.2 percent of whites had voted, throughout Mississippi. Dr. Lichtman testified that these estimates of black participation were overstated. Dr. Lichtman gave similar testimony before this court in *Mississippi State Chapter Operation PUSH v. Allain*, 674 F.Supp. 1245 (N.D.Miss.1987). Regarding that issue, the court therein found that

> [t]he census data on registration are based on self-reporting, which research has shown to be inaccurate when the self-reported data on registration and voter turnout are compared to actual registration and voting records. J.P. Katosh and M.W. Traugott, *The Consequences of Validated and Self-Reported Voting Measures*, 45 Public Opinion Quarterly, 519 (1981).... The 1984 census figures are also based on a survey of a very small sample of Mississippians, which may or may not reflect their proportion in Mississippi's population, and an even smaller group of black respondents.

*Operation PUSH*, at 1254-55. The court notices the legislative fact of the inaccuracy of the 1984 census figures for black

---

**3.** There is no issue in the instant case regarding a candidate slating process. No evidence was submitted at trial on the existence of racial appeals in political campaigns.

voter registration and turnout. The unreliability of those state-wide figures does not, however, indicate in any way the affirmative fact of disproportionate registration and turnout in Chickasaw County.

There has been some general testimony for both parties regarding black registration and turnout. Such testimony was unconvincing. Dr. Lichtman, on cross examination, admitted that some other demographers believed that registration and voter turnout nationwide was higher among blacks than whites. He stated that there was a difference of opinion on that issue which would, he hoped, be settled by analysis of the 1988 elections. The court finds that plaintiffs have not borne their burden of proof on this element.

The "searching and practical evaluation of the 'past and present reality', whether the political process is equally open to minority voters", required by *Gingles*, 478 U.S. at 79, 106 S.Ct. at 2781, 92 L.Ed.2d at 65, may be broad enough to include consideration of the proof adduced at trial on this issue; the "typical factors" are merely guideposts in applying the totality of the circumstances test. Given the weight of the primary evidence in this case, the court does not deem it necessary to decide whether the "totality of the circumstances" may include in the balance proof of matters not proven in every element by a preponderance of the evidence.

Of the two additional factors identified in the Senate Judiciary Committee's Majority Report, the only one at issue in the present case is "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group."[4] The only area in which plaintiffs have demonstrated a lack of responsiveness is in the employment of blacks in non-elected official positions in county and municipal government. The parties could point to only one black person employed in the government in Chickasaw County, outside of an elected or appointed public office;

one black person was hired in 1988 in the tax assessor's office.

### III. Conclusions of Law

#### A. *Section 2*

This court has jurisdiction of the parties and subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 1973.

■ The defendants obtained preclearance for the existing plan in accordance with Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c. Such preclearance does not preclude the plaintiff class from challenging the plan under Section 2. *See Martin v. Allain*, 658 F.Supp. 1183, 1200 (S.D. Miss.1987).

■ Chickasaw County is a political subdivision covered by the Voting Rights Act. Realignment of election districts is a voting practice or procedure within the meaning of Section 5. *Cf., United States v. Board of Supervisors of Warren County, Miss.*, 429 U.S. 642, 97 S.Ct. 833, 51 L.Ed.2d 106 (1977).

■ Section 2 of the Voting Rights Act was amended in response to *Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), which had held that Section 2 required a showing of intent to prove the violation. The amendment clarified the statute, doing away with any element of intent. Section 2(b) mandates the use of a "totality of the circumstances" test. The court herein has made "a searching and practical evaluation of the 'past and present reality', whether the political process is equally open to minority voters." *Thornburg v. Gingles*, 478 U.S. 30, 79, 106 S.Ct. 2752, 2781, 92 L.Ed.2d 25, 65 (1986). Weighing the evidence in the instant case, this court concludes that Chickasaw County's 1983 redistricting plan for supervisory districts violates Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973. In light of the extreme racial polarization in voting, and the near total failure of at-

---

**4.** Plaintiffs attempt to argue, unconvincingly, that there is an issue as to the tenuousness of the connection between the county's legitimate, stated policies and the passage of this plan. By

all the relevant evidence, this plan represents a good faith attempt to balance the conflicting "legitimate" interest of Chickasaw County.

tempts by black candidates to be elected to those offices which are based on the county's supervisory districts, the conclusion is inescapable; the existing plan, by which a cohesive, contiguous black population which constitutes 36 percent of the total population and 31 percent of the voting age population of the county is disbursed so as to constitute a dispositive minority in each district, deprives black voters of an opportunity equal to that of other members of the electorate to participate in the political process and to elect representatives of their choice. The presence of the other factors that have been shown in this case is, of course, supportive of this determination. *Gingles,* at 48, n. 15, 106 S.Ct. at 2766, n. 15, 92 L.Ed.2d at 45.

Of those factors which plaintiffs have failed to prove, none weighs strongly against the plaintiffs' case. The evidence on the issue of black voter registration and turnout is completely inconclusive; plaintiffs have shown that defendants' reliance on census figures is misplaced, but neither party proved what the actual figures were. Given prior court findings throughout Mississippi that black political participation is disproportionately low, *e.g., Kirksey v. Board of Supervisors,* 554 F.2d 139 (5th Cir.1977); *Jordan v. Winter,* 604 F.Supp. 807 (N.D.Miss.1984), the court is unwilling to rely heavily on a presumption of equal participation.

A general history of responsiveness, if established, would fail to rebut the evidence of a Section 2 violation. *Jones v. City of Lubbock,* 727 F.2d 364, 382 (5th Cir.1984) (noting "the diminished role" of responsiveness under results test); S.Rep. No. 97–417, 97th Cong. 2 Sess. 29 (lack of proof on responsiveness does not weaken plaintiffs' Section 2 claim). A benevolent monarchy would be nonetheless non-democratic.

## B. *Remedies*

The court heard testimony and accepted documentary evidence from both the plaintiff class and the defendant county on proposed remedies. Both parties submitted proposed redistricting plans which would,

in their respective opinions, comply with Section 2 of the Voting Rights Act of 1965. This court, taking into account the holding of the Supreme Court in *United States v. Board of Supervisors of Warren County, Miss.,* 429 U.S. 642, 97 S.Ct. 833, 51 L.Ed.2d 106 (1977), notes that the court's jurisdiction is confined to a consideration of precleared redistricting plans for violations of Section 2 and the question of whether or not any proposed remedy, not already precleared, falls within the purview of Section 5. The redistricting of Chickasaw County, clearly falls within the purview of Section 5 of the Voting Rights Act which provides that such a plan must be submitted for preclearance by the office of the United States Attorney General for the United States District Court for the District of Columbia prior to implementation. The court may not, under *Warren County,* make a determination that a plan which has not been given Section 5 preclearance is valid under Section 2; jurisdiction to make such a judicial determination is vested solely in the District Court for the District of Columbia by the express provision of Section 5. *Warren County,* at 645, 97 S.Ct. at 834, 51 L.Ed.2d at 110. A court may order into effect an interim plan. *See, e.g., Upham v. Seamon,* 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982) (and cases cited therein).

■ The court received the plans submitted by the parties, and shall consider their respective merits so as to reach a determination, binding on both parties to this action, as to a plan suitable for submission for preclearance pursuant to Section 5. Having considered the submissions of the parties, the court is of the opinion that neither plan is suitable.

Unlike plaintiffs' proposal, a suitable plan would not be unnecessarily disruptive, and would comport, where possible, with the county's legitimate aims. It must be borne in mind that supervisory districts are more than mere compilations of population data; plaintiffs' plan competently considered the figures. Plaintiffs did not consider, however, in drafting that plan, such elements as avoidance of disruption of

present taxing districts, voting precincts, and polling places. Nor did the plaintiffs consider the effect of the proposed boundaries on cohesive neighborhoods. These are factors which take on importance to the people who make up the supervisory districts. *Jordan v. Winter*, 604 F.Supp. 807, 814 (N.D.Miss.1984) (three judge panel), *aff'd*, 469 U.S. 1002, 105 S.Ct. 416, 83 L.Ed. 2d 343 (1984). Nor did the plaintiffs consider the residences of the present supervisors; under plaintiffs' plan, three of the present supervisors would live in one district. *Id.*, at 814. Administratively most important, plaintiffs did not consider the equality of road and bridge mileage between the districts. The available county funds are split evenly between the five districts, and each supervisor separately administers his own district; if one district has substantially more roads and bridges than the others, that district is disadvantaged. "In fashioning a reapportionment plan or in choosing among plans, a district court should not pre-empt the legislative task nor 'intrude upon state policy any more than necessary.'" *Upham v. Seamon, supra*, quoting *White v. Weiser*, 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973).

Defendants' proposal divided the county's population in the following manner:

| District # | Total Population | White | Black | Other | Percent Black |
|---|---|---|---|---|---|
| 1 | 3569 | 2562 | 991 | 16 | 27.77 |
| 2 | 3495 | 2467 | 1025 | 3 | 29.33 |
| 3 | 3600 | 1228 | 2363 | 9 | 65.64 |
| 4 | 3460 | 2402 | 1053 | 5 | 30.43 |
| 5 | 3729 | 2724 | 1002 | 3 | 26.87 |

The five districts thus created would have a 7.54 percent average deviation from an ideal district size of 3,570.6.

The court is not satisfied with defendants' plan on numerical grounds. Defendants' plan provides for one "safe" district with a black population majority of over 65 percent and a substantial black voting age population majority.[5] Other than in that district, however, the black population is almost equally divided, effectively minimizing black voting strength.

Nothing in the Voting Rights Act provides for the creation of so-called "safe" districts, *Jordan v. Winter*, at 614. Indeed, Section 2(b) specifically disavows any right to proportional representation. As plaintiffs have failed to show that blacks in Chickasaw County register and vote in lower percentages than do whites, no need has been shown for adjustments to be made on that basis to the voting age population figures. Section 2(b) of the Voting Rights Act guarantees only the right of citizens to an equal *"opportunity ... to participate in the political process and to elect representatives of their choice."* Both proposals submitted to this court, however, appear to take as their foundation the creation of "safe" districts of at least 65 percent black populations. Such a division is contrary to the intent of Congress in enacting Section 2(b); "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." Voting Rights Act, Section 2(b) codified at 42 U.S.C. § 1973;

---

**5.** Assuming the same ratio of black total population to black voting age population (VAP) as in the county as a whole, that being 88.37%, the black VAP in District 3 should be 58.01%. The parties have provided little information to this court on the voting age population of Chickasaw County or the proposed districts.

The 1980 census general population characteristics for Chickasaw County, Table 45, 26–108 Mississippi, provides the following information. In 1980 the VAP for all black and white citizens for the county was 11,936, of which blacks constituted 3,802, or 31.85 percent, and whites constituted 8,134. In the same year, now nearly nine years ago, blacks constituted 33.95 percent of the population age 10 and over, and 34.24 of the population age 9 and over, but only 27.37 percent of the population 62 and over. It is not possible to accurately forecast from this limited data a current black VAP, but it is safe to presume from these figures that the present black VAP is substantially higher than that for 1980.

*Jordan v. Winter, supra; Houston v. Haley,* 663 F.Supp. 346, 348 (N.D.Miss.1987), *aff'd,* 859 F.2d 341 (5th Cir.1988). Such a concentration is objectionable also because it unnecessarily diminishes black voting strength in other districts, where blacks could have greater political impact. This factor is especially important where, as here, the elected official governs, solely and autonomously, the district which elects him.

Defendants apparently have relied on the decision in *Houston v. Haley, supra,* in which the court approved an aldermanic redistricting plan for the City of Oxford, Miss., which provided for one majority black aldermanic district with a total black population of 53.8%, and no other significant black population. The court distinguishes the case *sub judice* from *Houston v. Haley,* in that the City of Oxford had a black population of only 21.2 percent, as opposed to 36.04 percent in Chickasaw County.

The court accordingly approves neither plan on an interim basis. The court therefore instructs the parties to attempt to reach agreement on a joint proposal, bearing in mind the guidelines discussed. In the event that the parties are unable to devise a plan that will comply with the aforementioned statutory and constitutional requirements, this court will have no alternative but to appoint an expert or special master to assist the court in the premises.

### IV. Conclusion

The court finds that the 1983 reapportionment of the five supervisory districts in Chickasaw County violate Section 2 of the Voting Rights Act of 1965. The plaintiff class is entitled to appropriate relief. The parties have submitted for the court's consideration alternative redistricting schemes; such may provide guidance in fashioning suitable interim relief, though the court declines to adopt either at this time.

An order in conformance with this opinion shall this day be issued.

### APPENDIX A, 1–5

From "Analysis of Racial Bloc Voting,
Chickasaw Country, Mississippi" by
Dr. Allan J. Lichtman.

TABLE 1
RACIAL BLOC VOTING IN CHICKASAW COUNTY, MISSISSIPPI
BLACK V. WHITE CONTESTS, ECOLOGICAL REGRESSION ESTIMATES *

|  | % OF BLACKS VOTING FOR BLACK CANDS. | % OF BLACKS VOTING FOR WHITE CANDS. | % OF WHITES VOTING FOR BLACK CANDS. | % OF WHITES VOTING FOR WHITE CANDS. |
|---|---|---|---|---|
| SHERIFF | 100 | 0 | 3 | 97 |
| CIRCUIT CLERK | 100 | 0 | 8 | 92 |
| JUSTICE COURT DIS. 1 | 100 | 0 | 6 | 94 |
| JUSTICE COURT DIS. 2 | 80 | 20 | 6 | 94 |
| MEAN, ALL ELECTIONS | 95 | 5 | 6 | 94 |

* THERE WERE SEVERAL ADDITIONAL BLACK V. WHITE CONTESTS IN PARTICULAR DISTRICTS WITHIN THE COUNTY HELD IN 1979 AND 1983. BUT IN EACH OF THESE CONTESTS THE NUMBER OF INCLUDED PRECINCTS WAS TOO SMALL FOR ANALYSIS OF THE BLACK AND WHITE VOTE. IN EACH SUCH ELECTION, THE BLACK CANDIDATE WAS DEFEATED BY A WHITE OPPONENT.

TABLE 2
RACIAL BLOC VOTING IN CHICKASAW COUNTY, MISSISSIPPI
ADDITIONAL BLACK V. WHITE CONTESTS, PERCENTAGES FOR BLACK CANDIDATES *

| | % OF BLACKS VOTING FOR BLACK | % OF BLACKS VOTING FOR WHITE | % OF WHITES VOTING FOR BLACK | % OF WHITES VOTING FOR WHITE |
|---|---|---|---|---|
| 1987 GENERAL LT. GOVERNOR | 100 | 0 | 1 | 99 |
| 1987 PRIMARY SHERIFF | 100 | 0 | 7 | 93 |
| MEAN, ALL ELECTIONS ** | 100 | 0 | 8 | 92 |

*THERE WERE ADDITIONAL BLACK V. WHITE CONTESTS IN PARTICULAR DISTRICTS WITHIN THE COUNTY HELD IN 1987. BUT IN EACH OF THESE CONTESTS THE NUMBER OF INCLUDED PRECINCTS WAS TOO SMALL FOR ANALYSIS OF THE BLACK AND WHITE VOTE. IN EACH SUCH ELECTION, THE BLACK CANDIDATE WAS DEFEATED BY A WHITE OPPONENT.

** THE BLACK VOTER MEAN EXLCUDES THE STATE TREASURER CONTEST WITH AN ESTIMATED ZERO BLACK TURNOUT.

---

TABLE 3
RACIAL BLOC VOTING IN CHICKASAW COUNTY, MISSISSIPPI, 1988
PRIMARY BLACK V. WHITE CONTEST FOR DEMOCRATIC PRESIDENTIAL NOMINATION PERCENTAGES FOR BLACK CANDIDATE

| | % OF BLACKS VOTING FOR BLACK CAND. | % OF BLACKS VOTING FOR WHITE CANDS. | % OF WHITES VOTING FOR BLACK CAND. | % OF WHITES VOTING FOR WHITE CANDS. |
|---|---|---|---|---|
| PRES. PRIM. | 100 | 0 | 7 | 93 |

---

TABLE 4
RACIAL BLOC VOTING IN CHICKASAW COUNTY, MISSISSIPPI
BLACK V. WHITE CONTESTS, SQUARED CORRELATION COEFFICIENTS STATISTICAL SIGNIFICANCE

| | SQUARED CORRELATION COEFF. | STATISTICAL SIGNIF. |
|---|---|---|
| 1983 PRIMARY | | |
| SHERIFF | .41 | .05 |
| CIRCUIT CLERK | .77 | .00001 |
| JUSTICE COURT DIS. 1 | .11 | – |
| JUSTICE COURT DIS. 2 | .43 | – |
| 1987 GENERAL LT. GOVERNOR | .74 | .00001 |
| 1987 PRIMARY SHERIFF | .38 | – |
| 1988 PRIMARY PRESIDENT | .72 | .0001 |

326

TABLE 5
RACIAL BLOC VOTING IN CHICKASAW, MISSISSIPPI, EXTREME
CASE ANALYSIS COMPARISON OF PLEASANT GROVE (96% WHITE)
AND WEST EGYPT (77% BLACK) 1983 AND 1988 PRIMARIES, BLACK
V. WHITE ELECTIONS

| | PERCENT FOR BLACK CAND. PLEASANT GROVE PRECINCT | PERCENT FOR BLACK CAND. WEST EGYPT PRECINCT |
|---|---|---|
| **1983 PRIMARY** | | |
| SHERIFF | .6 | 52 |

| | PERCENT FOR BLACK CAND. PLEASANT GROVE PRECINCT | PERCENT FOR BLACK CAND. WEST EGYPT PRECINCT |
|---|---|---|
| CIRCUIT CLERK | 3 | 62 |
| **1988 PRIMARY** | | |
| PRESIDENT JACKSON | 1 | 77 |

APPENDIX B
Unsuccessful Black Candidates for County-wide and District-wide Office in
Chickasaw County, Mississippi.

| Election Year | Office | Candidate |
|---|---|---|
| 1987 | Sheriff | John H. Moore |
| 1987 | Supervisor, District 4 | Clifton R. Whitley |
| 1987 | Constable, District 2 | Polee Webber |
| 1987 | Supervisor, District 2 | Odell Bowers |
| 1983 | Sheriff | Frank Tucker |
| 1983 | Circuit Clerk | Willie C. Harris |
| 1983 | Justice Court Judge (District 1) | Larry Mims |
| 1983 | Constable, District 1 | Senoria Cousin, Sr. |
| 1979 & 1983 | Constable, District 2 | Ocie L. Vance |
| 1979 | Constable, District 4 | Senoria Cousin, Sr. |