**Calvin EWING, et al., Plaintiffs,**

**v.**

**MONROE COUNTY, MISSISSIPPI, et al., Defendants.**

**No. EC86–37–B–D.**

United States District Court,
N.D. Mississippi, W.D.

June 29, 1990.

Ellis Turnage, Cleveland, Miss., for plaintiffs.

S. Allan Alexander, Grady F. Tollison, Oxford, Miss., Jack N. Thomas, Amory, Miss., Robert Patterson, Aberdeen, Miss., for defendants.

MEMORANDUM OPINION

BIGGERS, District Judge.

I. Introduction

This class action challenges the validity of Monroe County, Mississippi's 1982 supervisory and justice court judge redistricting plans which are used to elect county

supervisors, county election commissioners, constables and justice court judges. The county board of supervisors in 1982 adopted the present plans after publishing notices in a county newspaper of the proposed plans and setting a date and place for a public meeting to receive reactions to the plans. No objections to the plans were made. In April, 1983, the defendants obtained preclearance of the plans from the United States Justice Department in accordance with Section 5 of the Voting Rights Act of 1965. 42 U.S.C. § 1973c.

The plaintiffs now challenge the plans under Section 2 of the Voting Rights Act, as amended, 42 U.S.C. § 1973, as well as the Fourteenth and Fifteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. *See Martin v. Allain,* 658 F.Supp. 1183, 1200 (S.D.Miss.1987) (Section 5 preclearance does not preclude a Section 2 challenge). A Section 2 violation requires proof only of a discriminatory result, regardless of intent, in the denial or abridgement of the plaintiffs' right to vote on account of race or color, whereas a constitutional violation requires a showing of a discriminatory intent in creating the plans. *Jones v. City of Lubbock,* 727 F.2d 364, 370 n. 2, 380 (5th Cir.1984). Having duly considered the testimony and exhibits admitted in the bench trial and the parties' post-trial memoranda, the court is of the opinion that the current plans violate Section 2 of the Voting Rights Act. Therefore, the court will not address the plaintiffs' other claims. *See Thornburg v. Gingles,* 478 U.S. 30, 38, 106 S.Ct. 2752, 2759, 92 L.Ed.2d 25, 38–39 (1986).

## II.  Findings of Fact

Monroe County encompasses 772 square miles and has five incorporated municipalities, including Aberdeen, the county seat located in the southern part of the county, and Amory, located in the northern part of the county. According to the 1980 census, the racial composition of the total population and voting age population (VAP) of Monroe County is as follows:

### General Population

| Total | Black | White/Other | % Black | % White/Other |
|---|---|---|---|---|
| 36,404 | 10,813 | 25,591 | 29.70% | 70.30% |

### Voting Age Population (VAP)

| Total | Black | White/Other | % Black | % White/Other |
|---|---|---|---|---|
| 22,813 | 6,179 | 16,504 | 27.08% | 72.92% |

According to the 1980 census, the City of Aberdeen has a total population of 7184 of which 56.25% are white or of other ethnic origin and 43.75% are black; the City of Amory has a total population of 7307 of which 77.28% are white or of other ethnic origin and 22.72% are black.

Monroe County is governed by a five-member board of supervisors elected from five single-member districts, the county election commissioners are also elected from the supervisory districts. Under the current supervisory redistricting plan of Monroe County, the racial composition of the total population and the black voting age population (BVAP) are as follows:

| District | Total | White | % | Other | % | Black | % | BVAP% |
|---|---|---|---|---|---|---|---|---|
| 1 | 7,020 | 5,932 | 84.5 | 5 | .1 | 1,083 | 15.4 | 14.0 |
| 2 | 7,359 | 6,066 | 82.4 | 17 | .3 | 1,276 | 17.3 | 16.0 |
| 3 | 7,188 | 4,474 | 62.2 | 4 | .1 | 2,710 | 37.7 | 33.0 |
| 4 | 7,494 | 3,938 | 52.6 | 16 | .2 | 3,540 | 47.2 | 43.0 |
| 5 | 7,343 | 5,134 | 69.9 | 5 | .1 | 2,204 | 30.0 | 28.0 |

Justice court judges and constables are elected from three single-member justice court judge districts. Under the current justice court judge redistricting plan of Monroe County, the racial composition of the population is as follows:

| District | Total | White | % | Other | % | Black | % |
|---|---|---|---|---|---|---|---|
| 1 | 11,959 | 10,295 | 86.1 | 5 | .1 | 1,659 | 13.9 |
| 2 | 12,368 | 6,285 | 50.8 | 21 | .2 | 6,062 | 49.0 |
| 3 | 12,077 | 8,964 | 74.2 | 22 | .2 | 3,091 | 25.6 |

A. Threshold Test

■ As a preliminary matter, the court must determine whether the plaintiffs have met the threshold test for Section 2 violations:

The three elements essential to this threshold finding are: (1) that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) that the minority is politically cohesive; and (3) that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate. [Plaintiffs'] failure to establish any one of these three elements of the *Thornburg* test is fatal to their claim.

*Brewer v. Ham,* 876 F.2d 448, 451 (5th Cir.1989).

Jerry Wilson, the plaintiffs' expert witness in the field of demography, testified that there are strong concentrations of blacks on the western side of the county, the southwest side of Amory, and in north and south Aberdeen. Wilson testified that the black concentrations in Aberdeen if combined would create a majority black voting age population in supervisory district 4. Dr. Ronald E. Weber, the defendants' expert witness, testified that the black concentrations in Aberdeen and Amory are not contiguous and are too scattered to form a majority black supervisory or justice court judge district without affirmatively gerrymandering. Vernon (Randy) Kelly, Director of Three Rivers Planning and Development District, a private, nonprofit corporation engaged in county and municipal planning, testified that gerrymandering involves purposefully drawing lines without any basis in order to dilute black or white voting strength that may result in divided voting precincts or district lines skipping over black or white areas to achieve a black or white majority. Dr. Weber testified that the map of the plaintiffs' proposed supervisory plan (Exhibit P–16) reflects that black concentrations in Aberdeen are geographically split by a white majority bloc in the center. However, C.E. (Bubba) Henley, a Monroe County Supervisor, testified that there are some blacks in the central area of Aberdeen. Dr. Weber testified that in his opinion the black concentrations may be sufficiently large in terms of numbers but are non-contiguous and therefore not sufficiently compact to constitute a single-member district with a majority black voting age population. Wilson testified that the black concentrations were sufficiently large and compact to constitute a majority of the voting age population in two supervisory districts, districts 4 and 5, and one justice court judge district. The court is convinced that the distribution of blacks throughout the county meets the first prerequisite so as to allow the creation of at least one supervisory district and one justice court judge district with a majority black voting age population.

■ The second and third prerequisites are complementary aspects of racial bloc voting in which race and voting behavior are interrelated. Racial bloc voting exists if "black voters and white voters vote differently." *Thornburg v. Gingles,* 478 U.S. at 53 n. 21, 106 S.Ct. at 2768 n. 21, 92

L.Ed.2d at 48 n. 21. The plaintiffs presented the expert testimony of Dr. Allan Lichtman on the issues of racial bloc voting and vote dilution. Dr. Lichtman applied two statistical methods to determine voting preferences of whites and blacks in Monroe County—ecological regression and extreme case analysis—that were accepted in *Thornburg v. Gingles.* In order to determine voting preferences, Dr. Lichtman compared the racial composition of each precinct to the division of the votes cast in each precinct for black and white candidates. Ecological regression is the method for inferring the voting behavior of whites and blacks, and extreme case analysis examines the actual choices of voters in the most heavily white and the most heavily black precincts in the county to compute any differences in the choice of black and white candidates. Dr. Lichtman studied only political contests between black and white candidates to determine the existence and extent of racial polarization and explained that analysis of white versus white races cannot undermine or buttress the analysis of the blacks' ability to elect candidates of their choice in black versus white races.

Dr. Lichtman's statistical analysis is based upon 1980 United States census population data, the county's election return tabulations by precinct, and data on the racial composition of the county's precincts obtained from the Mississippi Court Commission on Legislative Reapportionment, supplemented by analysis of redistricting since 1982 in four altered precincts. Dr. Weber testified that alternative updated sources of data would be better than the 1980 census figures. Dr. Lichtman testified that reliance on the 1980 census is customary and acceptable and that other sources, such as exit polls, are not necessarily more reliable. Dr. Weber further challenged Dr. Lichtman's reliance on census data that does not add up to the total voting age population figures. Dr. Lichtman admitted that the voting age population figures were approximately 7% short of the actual voting age population but explained that the discrepancy did not affect his analysis based upon his determina-

tion that the missing percentages would not substantially alter the demographic compositions of precincts. Dr. Weber testified, on the other hand, that the missing percentages are not equally distributed throughout the black and white populations, thereby affecting the demographic composition.

In Dr. Weber's opinion, it is unacceptable to apply the ecological regression method to districts with a small number of precincts, six or seven, absent significant variation in the racial composition of the precincts. Dr. Lichtman admitted that the supervisory districts have relatively few precincts but explained that he tested the validity of his results by examining the correlation between support for black candidates in each precinct and the percentage of black voters in each precinct and computed the statistical significance of his regression equations to determine the likelihood that his results were random. The extreme case analysis, as applied to precincts in which the black population is above 70%, is unacceptable according to Dr. Weber who testified that only 90% white or 90% black precincts provide reliable results. Dr. Lichtman testified that the statistics for a 70%+ black precinct are equally accurate but do not allow him to "completely nail down" the actual voting behavior of blacks. The defendants seek to exclude from the court's consideration Dr. Lichtman's entire testimony. The court finds that Dr. Weber's criticisms go to the weight Dr. Lichtman's testimony is to be given by the court and not to its admissibility.

Dr. Lichtman analyzed primaries for twelve district and county elections, one district run-off election, and the Monroe County returns for two statewide primaries and the 1988 Presidential Preference Primary. John Darden, a black alderman in Amory, testified that local races may be distinguishable from the other races, particularly the 1988 primary involving Jesse Jackson's national high-profile campaign, in terms of black voting patterns. The court finds that only district and county races should be reviewed in determining the is-

sue of black political cohesion in Monroe County. Dr. Lichtman testified that there is a "crystal clear" pattern of political cohesion among blacks in county and district elections and white cross-over voting is consistently low or nonexistent. He further testified that the election results show that white voters tend to strongly prefer white candidates over black candidates and that black voters tend to strongly prefer black candidates over white candidates. Dr. Lichtman is of the opinion that his analyses reveal "severe and persistent racial polarization" in Monroe County and that his extreme case analysis produced "very, very powerful evidence" of racially polarized voting among both black and white voters. He concluded that white bloc voting has consistently defeated black candidates, as reflected in his studies, and that the level of white cross-over voting is insufficient to provide an opportunity to black voters in Monroe County to elect the candidate of their choice.

The court finds that Dr. Lichtman's ecological regression analysis is valid but that his opinion may be somewhat overstated in light of the 7% discrepancy in the voting age population figures and the relatively low number of precincts in each supervisory district. Since Dr. Lichtman used 70%+ black precincts in his extreme case analysis, the court finds that the results do not conclusively establish actual black voting preferences but are at least consistent with the overall low black cross-over voting reflected in the ecological regression analysis. However, the court finds that the minimal support for black candidates in Monroe County's fifteen 90%+ white precincts does establish the actual preference of white voters and parallels the overall low white cross-over voting reflected in the ecological regression analysis. No black candidate has prevailed in a county or district election in Monroe County in the 20th Century and, as Dr. Lichtman concluded, such electoral failure is what is expected based on his analyses.

The defendants assert that Dr. Lichtman disregarded the lay testimony of the plaintiffs' witnesses, John Darden and Bobby Sacus, the black Vice–Chairman of the Monroe County Democratic Executive Committee, regarding the viability of certain black candidates in the black community. Dr. Lichtman explained that he determined the viability of a candidate based upon the percentage of votes cast for that candidate and eliminated from consideration any campaign in which the black candidate received a very low percentage. Dr. Weber testified that the viability of a candidate should be determined objectively. Dr. Lichtman explained that his selection of campaigns was subjective only to the extent that he excluded "fringe" elections based upon a minimum percentage and that otherwise, his selection process was objective since it was based on election returns.

The court notes the additional testimony of Darden and Sacus that the majority of black voters in Monroe County voted for white Democrats in certain national and statewide campaigns against black candidates who were running as an independent or Republican candidate. In those campaigns blacks elected candidates of their choice by forming a coalition with white Democrats. This voting behavior does not undermine Dr. Lichtman's conclusion that in most district and county elections blacks support black candidates who are defeated as a result of zero or minimal white cross-over voting. The court is convinced that, with respect to·contests for offices based on the county's supervisory and justice court judge districts, black voters as a whole are politically cohesive and that a black candidate is the preferred candidate who is usually defeated by white bloc voting.

### B. "Totality of the Circumstances" Test

■ Having found that the plaintiffs have met the threshold test, the court must consider the "totality of the circumstances." In doing so, the court is guided by the seven *Zimmer* factors adopted by Congress in amending Section 2 as follows:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to reg-

ister, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous.

*Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir.1973) (en banc), *aff'd sub nom. East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976).

### 1. Historical Discrimination

The parties stipulated that before enactment of the Voting Rights Act there was *de jure* discrimination in the State of Mississippi. However, there is evidence that even those state statutes which imposed restrictions on the right to register to vote were not enforced in Monroe County to prevent black voters from registering or actually voting. Based on the uncontroverted testimony of Charlotte Williams, the present Circuit Clerk and Registrar of Monroe County and employee of the circuit clerk's office since 1964 before enactment of the Voting Rights Act, no black person of voting age in Monroe County has been refused registration for any reason since 1964. Prior to any general election and at other times, the Monroe County Registrar makes publicized visits to each precinct to register voters, regardless of race. In addition, the circuit clerk's office remains open on Saturday prior to any deadline for qualifying to vote to accommodate anyone desiring to register. No federal registrars or poll watchers have ever visited Monroe County. The court finds no evidence that black voter registration is presently impeded by any historical official discrimination.

Dr. Lichtman testified that based upon his ecological regression method the turnout of the white voting age population exceeded that of the black voting age population by an average of 27 percentage points in five black versus white elections since 1975. However, Dr. Weber testified that the disparity between white and black voting turnout is continuously shrinking. His analysis of the September, 1989 special election for the Aberdeen Board of Aldermen showed that black turnout was significantly higher than white turnout. In addition, in the 1988 Presidential Primary Jesse Jackson carried justice court judge district 2 which has a white majority. Since there was no white cross-over vote for Jackson, the black turnout in justice court judge district 2 necessarily was higher than the white turnout in that district. The court notes the recent black versus white run-off in the Democratic primary for circuit court judge in the First Judicial District on June 26, 1990. This information was not available at the time of the trial but the court will take judicial notice of the results only. Barry Ford, a black candidate, received a

majority of the votes over a white candidate in Monroe County's supervisory districts 3, 4 and 5. These supervisory districts have a black voting age population of 33%, 43% and 28%, respectively. In light of the political cohesion among black voters in Monroe County, these election results indicate high black turnout. The court finds no evidence of any present impediment to black voter participation as a result of any lingering effects of discrimination.

### 2. Racially Polarized Voting

As discussed above, the court finds that a pattern of voting behavior in county and district races clearly shows "legally significant" racial polarization among both black and white voters. *See Thornburg v. Gingles*, 478 U.S. at 56, 106 S.Ct. at 2769, 92 L.Ed.2d at 50 ("a white bloc vote that normally will defeat the combined strength of minority support plus white 'cross-over' votes rises to the level of legally significant white bloc voting"), *quoted in Houston v. Haley*, 859 F.2d 341, 345–46 (5th Cir.1988), *vacated on other grounds*, 869 F.2d 807 (5th Cir.1989). In Monroe County, there is a decisive correlation between the race of the voter and his electoral preference in county and district elections.

### 3. Use of Voting Practices Which May Enhance the Opportunity for Discrimination

A majority vote requirement is prescribed by statute in Mississippi. Miss. Code Ann. § 23–15–305 (Cum.Supp.1989). The court finds that with little or no white cross-over votes this requirement makes it more difficult but not impossible for blacks to elect candidates of their choice under the current redistricting plans. As noted in the 1988 Presidential Primary, Jesse Jackson carried a district with less than 50% black voting age population; and in the 1990 circuit court judge's election a black candidate was elected and carried supervisory districts 3, 4 and 5 in Monroe County, all three districts having a majority white voting age population. There is no allegation that any other practices or procedures are currently used to enhance the opportunity for discrimination against blacks in Monroe County.

### 4. Candidate Slating Process

There is no proof of a slating process in Monroe County.

### 5. Socio–Economic Disparities

Disparities in housing, income, employment and education do exist between whites and blacks in Monroe County. Historically, such disparities have been less pronounced in Monroe County than elsewhere in the state, particularly the Second Congressional District (Mississippi Delta), according to the testimony of Dr. James Cobb, a historian who specializes in history of the South. Dr. Cobb testified that blacks traditionally have had higher educational attainment, land ownership and economic opportunity than in most other counties in Mississippi. John Darden and Randy Kelly corroborated his testimony as to land ownership and improvement in economic opportunity for blacks as well as whites through industrial development since 1980. Jan Patterson, an attorney in Aberdeen, testified that county land records maintained in her office for title work show black ownership of over 10,000 acres for an average length of more than 70 years. All health facilities in the county are available to everyone regardless of race, and all public education systems have been completely desegregated for approximately 20 years.

Dr. Lichtman concluded that socio-economic disparities are linked to a lower level of black political participation in Aberdeen, Amory and Monroe County as compared to white involvement. The court agrees with Dr. Weber's testimony that Dr. Lichtman improperly extrapolated disparities in the county from census data of national voter registration and turnout in the November, 1984 election. In addition, the court notes that Dr. Lichtman criticized such data in *Push v. Allain*, 674 F.Supp. 1245 (N.D. Miss.1987), as unreliable as a result of overreporting of voter turnout. The plaintiffs' lay witnesses testified that a disproportionately high percentage of black

households do not have a car and that volunteer voter registration drives are dependent on the provision of transportation to prospective voter registrants. However, the court finds no evidence of a disproportionate level of black voter participation in Monroe County. In fact, the black turnout in the 1989 alderman election in Aberdeen was higher in the 93% black ward than the white turnout in more affluent wards. The court further finds that any existing disparities, including campaign financing, do not substantially affect blacks' ability to participate effectively in the political process.

### 6. Racial Appeals During Political Campaigns

There is no evidence before the court of any racial appeal, overt or subtle, in any political campaign. John Darden, the black alderman from Amory, testified that local organizations invite black and white candidates, and white politicians openly seek black support just as Ewing, the named plaintiff, openly sought white support. Darden further testified that Tyrone James, a black candidate for alderman at large in Amory had substantial white support during his campaign and was invited to a white Methodist church. Jimmy Kirkpatrick, a white Monroe County Supervisor, testified that he sought black support when running for supervisor.

### 7. Extent to Which Blacks Have Been Elected to Public Office

No black in Monroe County has been elected to a district office for the positions of supervisor, justice court judge, constable, and election commissioner. No black has been elected to a county-wide office in Monroe County including the offices of sheriff, tax assessor, coroner, chancery clerk, circuit clerk, and county attorney. John Darden was first elected in 1981 from a newly created 90% black ward in a four-ward and one at-large electoral scheme and was reelected in 1985 and 1989. Black aldermen have been elected in Aberdeen which has approximately a 93% black ward and a 70% black ward in a five-ward electoral scheme.

### 8. Responsiveness

The plaintiffs and defendants offered evidence on the issue of responsiveness of public officials, particularly the Board of Supervisors, toward black residents of Monroe County. John Darden testified that the board of supervisors has always been responsive to his requests on behalf of his constituents. Darden was appointed to the Board of Directors of Three Rivers Planning and Development District upon the recommendation of the board of supervisors. In supervisory district 4 approximately 70% to 75% of road paving in the past six years has been in the black residential areas. Monroe County was one of the first counties in Northeast Mississippi to replace the old procedure of supervisors selecting persons to serve on petit and grand juries with selections based upon random selection from voter registration books and land records, regardless of race. There has always been a black among the three Jury Commissioners appointed in Monroe County. In addition, Monroe County was one of the first counties to participate in the regional housing authority which is responsible for construction of low-rent housing in the county. The court finds that the government in Monroe County, particularly the supervisors, have been responsive to the needs of blacks in their districts.

### 9. Tenuousness of any Underlying Policy

There is no state or county policy requiring majority white voting age populations in all supervisory and justice court judge districts.

### III. Conclusions of Law

The court has jurisdiction of the parties and subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 1973. Monroe County is a political subdivision covered by the Voting Rights Act and the existing redistricting plans are voting practices or procedures within the meaning of Section 5.

The plaintiffs challenge the existing redistricting plans of white majority supervisory and justice court judge districts on the ground of racial vote dilution in violation of amended Section 2 of the Voting Rights Act. A violation of amendment Section 2 is established if

> based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973(b) (1982). The "totality of the circumstances" test is a "flexible, fact-intensive test" that identifies circumstances deemed to be possibly probative of unequal access to the electoral process and ineffective political participation. *Thornburg v. Gingles*, 478 U.S. at 46, 106 S.Ct. at 2764, 92 L.Ed.2d at 43–44. The court's inquiry "requires 'an intensely local appraisal of the design and impact' of the contested electoral mechanisms." *Houston v. Haley*, 859 F.2d at 347 (quoting *Thornburg*, 478 U.S. at 79, 106 S.Ct. at 2781, 92 L.Ed.2d àt 65). The test is flexible in that:

> there is no requirement that any particular number of factors be proved or that a majority of them point one way or the other.

*Thornburg*, 478 U.S. at 45, 106 S.Ct. at 2763, 92 L.Ed.2d at 43 (quoting S.Rep. No. 97–417, 97th Cong. 2 Sess. 28–29, *reprinted in* 1982 U.S.Code Cong. and Admin. News pp. 177, 206–07).

The Supreme Court in *Thornburg* acknowledged that "the extent to which minority group members have been elected to public office in the jurisdiction" and the extent of racially polarized voting are the two most critical factors. 478 U.S. at 48 n. 15, 106 S.Ct. at 2765 n. 15, 92 L.Ed.2d at 45 n. 15, *cited in Gunn v. Chickasaw County*, 705 F.Supp. 315, 320 (N.D.Miss.1989). The total failure of attempts by numerous black candidates to be elected to the offices which are based on Monroe County's white majority supervisory and justice court judge districts is of utmost concern to the court. The court is fully aware that, as stated in amended Section 2, there is no right to proportional representation and that it is denial of an *equal opportunity* (emphasis added) to elect preferred candidates that is prohibited. *Houston v. Haley*, 859 F.2d at 343–44, 347. The court finds that racially polarized voting in Monroe County prevents black candidates from effectively seeking and obtaining white votes, as evidenced by the minimal extent of white cross-over voting. The municipal electoral success of black aldermen in Aberdeen and Amory from black majority wards does not negate the plaintiffs' proof of white bloc voting. *Gunn v. Chickasaw County*, 705 F.Supp. at 319 (election of black aldermen in two cities from black majority wards is not probative of white cross-over voting). On the contrary, such success in relation to the racial composition of the wards is consistent with the court's finding of political cohesion among the blacks in supporting black candidates and "shows that the election structure does make a difference." *McMillan v. Escambia County*, 748 F.2d 1037, 1045 (5th Cir. 1984). The court concludes that black candidates consistently lose elections for district-wide and county-wide offices in Monroe County "because the majority of voters choose their preferred candidates on the basis of race." *Jordan v. Winter*, 604 F.Supp. 807, 812–13 (N.D.Miss.) (three-judge court), *aff'd summarily*, 469 U.S. 1002, 105 S.Ct. 416, 83 L.Ed.2d 343 (1984). Therefore, the court finds that racial bloc voting dilutes black voting strength in each of the supervisory and justice court judge districts where blacks constitute a minority of the voting age population. *See Rogers v. Lodge*, 458 U.S. 613, 623, 102 S.Ct. 3272, 3279, 73 L.Ed.2d 1012, 1022 (1982) ("without bloc voting the minority candidates would not lose elections solely because of their race"), *quoted in Jordan v. Winter*, 604 F.Supp. at 813. The statutory majority vote requirement further diminishes the chance for blacks to be elected in majority

white voting age population districts. *Jones v. City of Lubbock*, 727 F.2d at 383 (citing *Rogers v. Lodge*, 458 U.S. at 627, 102 S.Ct. at 3280, 73 L.Ed.2d at 1024).

The evidence regarding the remaining factors does not weigh strongly against the plaintiffs' claim of racial vote dilution. The extensive social and economic progress of blacks in Monroe County, as compared to other counties in Mississippi, does not militate against the need for redistricting. As long as blacks constitute a minority in every district, the election of a black candidate in any district or county race is highly unlikely even amidst the shrinking disparity between black and white voter turnout. In addition, Monroe County's history of responsiveness to the needs of black citizens does not rebut evidence of a Section 2 violation. *Gunn v. Chickasaw County*, 705 F.Supp. at 322 (citing *Jones v. City of Lubbock*, 727 F.2d at 382). These factors carry greater weight in the court's consideration of the percentage of blacks in a single-member district necessary to project victory of a preferred candidate. Therefore, the court finds that based upon the totality of the circumstances in Monroe County the existing plans deprive black voters of an opportunity equal to that of other members of the electorate "to participate in the political process and to elect representatives of their choice" in violation of amended Section 2.

## IV. Remedies

The court finds that redistricting is necessary in order to remedy the Section 2 violation in Monroe County. Both the plaintiffs and defendants submitted alternative plans and the court heard testimony and accepted documentary evidence on the proposed remedies. Upon due consideration, the court finds that neither proposal is suitable for submission for preclearance under Section 5 or interim relief. *See Gunn v. Chickasaw County*, 705 F.Supp. at 322 (court's jurisdiction is limited in voting rights actions) (citing *United States v. Board of Supervisors of Warren County, Mississippi*, 429 U.S. 642, 645, 97 S.Ct. 833, 834, 51 L.Ed.2d 106, 110 (1977)). It appears to the court that two supervisory districts with a black-white voting age population in the 51–55% range for blacks in one district and a 51–55% white voting age population in the other, and a justice court judge district with a black voting age population in the 51–55% range would insure an equal opportunity of candidates, regardless of race to be elected in any of the districts.

The parties should prepare and submit for preclearance a supervisory district plan in which district 4 has a black voting age population in the range of 51–55% and district 3 has a black voting age population in the 45–49% range. The justice court judge district plan should include one district with a black voting age population in the range of 51–55%.

These percentages will maximize black voting strength in one district under each plan without unduly diminishing black voting strength in other districts. *See Houston v. Haley*, 859 F.2d at 348 (a plan creating one ward with a 53.8% black population is valid under Section 2); *Jordan v. Winter*, 604 F.Supp. at 814 ("a clear black voting age population majority of 52.83% [was] sufficient to overcome the effects of past discrimination and racial bloc voting and provide a fair and equal contest to all voters ..."). It is clear that a range of 51–55% black voting age population is sufficient to enable blacks to elect candidates of their choice in Monroe County. As previously noted, Jesse Jackson carried justice court judge district 2 with a 49% black population, and Barry Ford, a black circuit judge candidate, carried three supervisory districts in Monroe County with a black voting age population in each of considerably less than 50%. In Itawamba County, an adjoining county, a black candidate for the office of constable, whose opponents were white, led the first and second primaries and won the general election in a majority white district.

The court instructs the parties to expeditiously prepare a joint proposal. The 1990 census has been taken and there has not been a supervisor or justice court judge election since 1983. If the parties are unable to agree on a plan, the court will appoint a special master to ensure that an

election will be held at the time the next election would regularly be held.

An order will issue accordingly.

### ORDER

In accordance with the memorandum opinion this day issued, it is ORDERED:

That the 1982 redistricting plans currently in force for supervisory and justice court judge districts are invalid under amended Section 2 of the Voting Rights Act of 1965;

That the plaintiff class is entitled to a new redistricting plan; and

That the parties must prepare a joint proposal within thirty days from the date of this order; otherwise, the court will appoint a special master at the parties' expense.